### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

REVENUE BASED FINANCE
COALITION,

      *Plaintiff,*

      *v.*

CONSUMER FINANCIAL
PROTECTION BUREAU; and ROHIT
CHOPRA, in his official capacity as
Director of the Consumer Financial
Protection Bureau,

      *Defendants.*

Civil Action No. _____

## COMPLAINT

1.     Plaintiff Revenue Based Finance Coalition ("RBFC") brings this action for declaratory and injunctive relief against Defendants Consumer Financial Protection Bureau ("CFPB" or the "Bureau") and Rohit Chopra in his official capacity as the Director of the CFPB.  Plaintiff RBFC challenges the CFPB's final rule amending the Equal Credit Opportunity Act ("ECOA") regulations that implement Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), *see* 88 Fed. Reg. 35,150 (May 31, 2023).  That rule violates the Adnistrative Procedure Act ("APA").

## INTRODUCTION

2.     This case concerns sales-based financing, a form of commercial financing that provides a distinct alternative to loans and other forms of credit.[1]  Sales-based financing transactions have a basic structure:  a small business receives a lump-sum payment in exchange for the right to receive a percentage of the small business's future sales or income (*e.g.*, future credit and debit card sales).

3.     Sales-based financing provides capital for small businesses to grow and thrive.  For more than two decades, sales-based financing has grown in popularity among small businesses due to its unique benefits.  Sales-based financing provides flexibility to small businesses because the obligation to repay is conditioned on the business actually generating revenue.  A business that does not generate revenue has no obligation to repay.  Accordingly, sales-based financing providers emphasize a business's ability to generate revenue through the sale of goods and services, not an individual's credit score.

4.     Critically, sales-based financing is not a form of credit.  The relevant statute defines "credit" as involving a right to *defer* a payment obligation.  *See* 15 U.S.C. § 1691a(d).   Sales-based financing, however, involves a substantially contemporaneous exchange of value—*i.e.*, rights to a percentage of revenue generated

---

[1] During the rulemaking process, the CFPB generally referred to "merchant cash advances" as the target of its regulation, but it also explained that merchant cash advances are a primary type of "sales-based financing."  The term "sales-based financing" has since become the widely adopted term for merchant cash advances, *see, e.g.*, NY Fin. Serv. Law § 801(j), VA Code Ann. § 6.2-2228, Conn. Stat. P.A. 23-201(8), 10 CA Admin. Code § 900(28), and so RBFC refers to "sales-based financing" throughout.

by a business's sale of goods and services in exchange for the sales-based financing provider's lump sum payment. Sales-based financing also lacks the critical hallmark of loans and other forms of debt: an absolute obligation to repay amounts advanced to the borrower. Sales-based financing generally imposes *no* absolute repayment obligation. The business's obligation to pay is contingent on actual revenue generated in the ordinary course of business. For these and other reasons, sales-based financing is analogous to factoring (i.e., the purchase of accounts receivable), which the CFPB and its predecessor historically recognized to be distinct from credit. Indeed, courts have repeatedly held that sales-based financing transactions are not loans.

5.  Recently, and for the first time, the CFPB has arrived at the view that sales-based financing is "credit"—a misguided and unlawful determination that poses a near-existential threat to the sales-based financing market. Section 1071 of Dodd-Frank authorizes the CFPB to implement and enforce data collection and reporting obligations related to small business applications for "credit." 15 U.S.C. § 1691c-2(b). This year, the Bureau promulgated a rule to implement Section 1071. Initially, the CFPB expressly stated that it planned *not* to cover sales-based financing under the regulation, given that sales-based financing is not "credit." But in an about-face, the CFPB took the opposite view, and the Section 1071 Rule—which Plaintiff RBFC challenges here—now subjects sales-based financing to the full panoply of collection and reporting obligations that apply solely to financial institutions that extend credit to small businesses.

6.     Applying the Section 1071 Rule to sales-based financing is unlawful, for three main reasons:

7.     *First*, the agency exceeded its authority under Section 1071 of Dodd-Frank by regulating sales-based financing as "credit." The statute's text, structure, purpose, and history make clear that sales-based financing transactions are not credit because they involve the contemporaneous exchange of value and lack the hallmarks of credit (*i.e.*, loans and other forms of debt). Since the Bureau's Section 1071 rulemaking authority extends to regulating only "credit," its new rule is contrary to law as applied to sales-based financing.

8.     *Second*, the CFPB's new rule is based on impermissible considerations that have no grounding in the statute. The agency justified its final rule, in part, because regulating sales-based financing as credit would purportedly create a "level playing field" to the benefit of sales-based financing providers' competitors. Although the statute identifies several other purposes that the Bureau may pursue when regulating, burdening one group of market participants to benefit that group's competitors is decidedly not on that list. To make matters worse, the CFPB completely failed to address RBFC's comments highlighting these issues. Considering impermissible factors and ignoring material comments make the agency's new rule arbitrary and capricious.

9.     *Third*, the CFPB failed to consider the unique benefits that sales-based financing brings to the small business financing market, along with the attendant and immense costs of subjecting sales-based financing transactions to the Section

1071 Rule.  Not only did the Bureau fail to consider these core implications of its new rule, but it again failed to address these concerns after RBFC raised them.  These administrative missteps further render the CFPB's new rule arbitrary and capricious as well.

10.     For these and the reasons articulated below, RBFC respectfully requests that the Court (1) declare that the CFPB's new rule is arbitrary, capricious, and contrary to law, and (2) set aside the rule on those grounds.

## PARTIES

11.     Plaintiff RBFC is a non-profit corporation organized under the laws of the State of Florida, with its headquarters at 8200 NW 52nd Terrace, Ste. 200, Miami, Florida 33166.  RBFC is primarily comprised of companies that provide needed capital to small and medium-sized businesses through innovative methods, including sales-based financing.  As a result, RBFC's members are directly harmed by the Final Rule.  *See infra* section IV.  RBFC was formed to bring companies together to advocate on various issues related to non-bank commercial finance.  RBFC is committed to educating legislators, policymakers, regulators, and the courts on the differences between sales-based financing and loans.

12.     Defendant CFPB is an agency of the United States.  12 U.S.C. § 5491(a).  The CFPB is tasked with implementing and enforcing a large body of financial consumer protection laws, including Section 1071 of Dodd-Frank.  Using that authority, the CFPB promulgated the regulation at issue here.

13.     Defendant Rohit Chopra is the Director of the CFPB.  Director Chopra is sued in his official capacity.

## JURISDICTION AND VENUE

14.     This action arises under the Constitution and the APA.  U.S. Const. Art. III, § 2; 5 U.S.C. §§ 701–706.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a).

15.     The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and injunctive relief pursuant to the APA, 5 U.S.C. §§ 702, 706(2), the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent equitable powers.

16.     Venue is proper in this District because Defendant CFPB is a United States agency and Defendant Chopra is sued in his official capacity, and because Plaintiff RBFC's principal place of business is in this District.   *See* 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

### I.     Sales-Based Financing

#### A.     Creation and Growth of Sales-Based Financing

17.     Sales-based financing was created as an alternative form of financing in the late 1990s. These transactions expanded significantly in volume and number after 2008, when banks started favoring large business loans with long repayment periods and began adopting stricter lending policies (e.g., higher credit score

requirements).[2]  This shift left many small businesses with insufficient access to working capital.

18.    Sales-based financing is a substantially contemporaneous exchange of value—*i.e.*, rights to a percentage of revenue generated by a business's sale of goods and services in exchange for the sales-based financing provider's lump sum payment. Thus, at the time of the transaction, the business receives the discounted value of the future revenue and the sales-based financing provider receives a right to a portion of the business's future revenue.

19.    Sales-based financing is considerably faster and has a less onerous application process than a loan.  The sales-based financing application process primarily focuses on past business performance to assess whether a business is forecasted to continue to generate the expected revenue.  This limited focus means that review and funding generally take only a few days.

20.    Given the emphasis on business performance, credit ratings are much less important, which can allow businesses with poor or limited credit histories to obtain capital through sales-based financing.

21.    For example, in a recent survey, sales-based financing proved to have the highest approval rates when compared to other types of financing.[3]

---

[2] *See* Bryant Park Capital, Merchant Cash Advance / Small Business Financing Industry Report 8 (2016), https://bryantparkcapital.com/wp-content/uploads/2018/06/BPC-MCA-SMB-Financing-Industry-Report.pdf.

[3] *See* Fed Small Business, Small Business Credit Survey 17 (2023), https://www.fedsmallbusiness.org/survey/2023/report-on-employer-firms.

22.     Sales-based financing providers also generally offer financing in smaller amounts than lenders, making sales-based financing particularly appealing to small businesses.

23.     Because of these benefits, sales-based financing is an especially attractive method of alternative financing for small businesses, since banks are often unable to profitably underwrite smaller financing amounts at speeds that small businesses need.

24.     There are more than 100 sales-based financing providers in the United States today.

**B.     Sales-Based Financing  Differs from Loans and Other Forms of Credit in Meaningful Ways.**

25.     In various respects, sales-based financing is fundamentally different from loans and other forms of credit.

26.     Unlike lenders, sales-based financing providers do not charge interest. Instead, sales-based financing providers apply a discount to the purchased amount of future revenue to determine the amount of the lump-sum amount paid to the receiving business.  For example, if a sales-based financing provider purchased $125,000 of future receivables from a business at a discounted rate of $100,000, the business would receive a $100,000 lump sum, and $125,000 of the business's future revenues would be earmarked as already belonging to the sales-based financing provider.  Unlike interest, which can usually be minimized by repaying a loan faster, the cost of a sales-based financing transaction to the business does not change over time.

27.     Also unlike loans, sales-based financing generally does not involve a fixed repayment term.  Because a business's payment obligation is contingent on sales of goods and services in the ordinary course, the speed with which the business repays the sales-based financing provider depends on future sales volume.

28.     Because repayment turns on future revenue, sales-based financing providers are not protected against the risk of business default.  In other words, the sales-based financing provider may receive no payment if the business does not generate sufficient receipts in the ordinary course of business.  The sales-based financing provider assumes the risk that the business will generate the revenue more slowly than anticipated, or not at all.  Sales-based financing thus involves equity-like risk for the sales-based financing provider.

29.     Indeed, state and federal courts across multiple jurisdictions have repeatedly held that sales-based financing does *not* create absolute repayment obligations, and thus cannot be considered a type of loan.  *See, e.g.*, *Womack v. Cap. Stack, LLC*, No. 1:18-CV-04192 (ALC), 2019 WL 4142740, at *7 (S.D.N.Y. Aug. 30, 2019) (collecting cases).

30.     Given its distinct characteristics, sales-based financing is not a "loan" or "credit."

31.     Instead, sales-based financing functions like nonrecourse factoring arrangements.  In nonrecourse factoring, a business sells an account receivable to a financing company  (referred to as a "factor") at a discount that reflects the risk that the account debtor will be unable to pay due to insolvency or bankruptcy.  As part of

this transaction, the business transfers the risk of nonpayment to the factor, a transfer that is an essential distinguishing characteristic in determining that a transaction is not "credit." Regulation B (which implements ECOA) has long provided that factoring is "not subject to" ECOA because it involves the "purchase of accounts receivable." *See* 12 C.F.R. pt. 1002, supp. I, § 1002.9(a)(3)-3.

32.     Similarly, sales-based financing involves the purchase of accounts receivable and a transfer of risk from the small business to the sales-based financing provider. By agreeing that the business's obligation to repay is contingent on the business's future revenue, the business obtains important working capital and transfers to the sales-based provider the risk that the business will fail to produce sufficient revenue from operations.

33.     Accordingly, sales-based financing has historically not been regulated as "credit" under ECOA or Regulation B.

34.     The sales-based financing industry grew and developed in reliance on that regulatory backdrop.

## II.     Statutory and Regulatory Background

### A.     Equal Credit Opportunity Act

35.     In 1974 and 1976, Congress enacted, and then amended and expanded, the Equal Credit Opportunity Act ("ECOA") to "require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers" "with fairness, impartiality, and without discrimination" on the basis of several protected characteristics. Pub. L. 93-495, § 502, 88 Stat. 1521 (codified as amended at 15 U.S.C. § 1691 *et seq.*).

36.     These provisions apply only to "creditors" engaged in extending, renewing, or continuing "credit."  15 U.S.C. §§ 1691(a), 1691a(e).

37.     The statute defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."  *Id.* § 1691a(d).

38.     The Board of Governors of the Federal Reserve was originally tasked with "prescrib[ing] regulations to carry out the purposes of" ECOA.  Pub. L. 93-495, § 503, 88 Stat. 1522; 15 U.S.C. § 1691b(a).

39.     The Board promulgated a regulation implementing ECOA, often called "Regulation B," *see* 40 Fed. Reg. 49,298 (Oct. 22, 1975), which the Board amended periodically, *see, e.g.*, 68 Fed. Reg. 13,144 (Mar. 18, 2003).  Since the Board's initial 1975 regulation, Regulation B has mirrored the definition of "credit" in ECOA.  *See* 12 C.F.R. § 202.3(h) (1976).

40.     Regulation B defined "credit" without material variation from how that term is defined in ECOA:  "Credit means the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor."  12 C.F.R. § 1002.2(j).

**B.     Dodd-Frank Wall Street Reform and Consumer Protection Act**

   **1.     Creation of the CFPB**

41.     In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), creating the CFPB and transferring regulatory authority under ECOA to that newly minted agency.  *See* Pub. L. 111-203, §§ 1011, 1085,  124 Stat. 1376, 1964, 2083 (2010); *see also* 15 U.S.C. § 1691b(a).

42.     The CFPB's structure was novel in two ways.  First, Congress prevented the President from removing the agency's sole director without cause, *see* 12 U.S.C. § 5491(c)(3), a restriction that the Supreme Court later found unconstitutional, *see Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).

43.     Second, Congress allowed the CFPB to circumvent the "annual appropriations process for funding" by "receiv[ing] funding directly from the Federal Reserve" based on the "amount that the Director deems 'reasonably necessary to carry out' the agency's duties." *Seila Law*, 140 S. Ct. at 2193–94 (quoting 12 U.S.C. § 5497(a)(1)).

44.     This unique funding structure violates the Constitution's fundamental prescription that "[n]o money shall be drawn from the Treasury [without] Appropriations made by Law," U.S. Const., art. I, § 9, cl. 7, and is thus also unconstitutional, *see Cmty. Fin. Servs. Ass'n of Am., Ltd.* ("*CFSA*") *v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023).

### 2.     Section 1071 of Dodd-Frank

45.     In addition to establishing the CFPB, Dodd-Frank also amended ECOA. In particular, Section 1071 of Dodd-Frank imposed new requirements—on financial institutions that offer or extend credit to small businesses—to collect and report to the CFPB data related to small business credit applications and applicants, including "women-owned, minority-owned, or small business[es]."  15 U.S.C. § 1691c-2(b), (f).

46.     Dodd-Frank also authorized the CFPB to "carry out, enforce, and compile data pursuant to [Section 1071]." *Id.* § 1691c-2(g)(1).

47.     By its plain terms, Section 1071 applies only to "application[s] … for *credit*" from "women-owned, minority-owned, or small business[es]." *Id.* § 1691c-2(b) (emphasis added).

48.     In addition to defining "women-owned" and "minority-owned," Section 1071 defines "small business" as businesses that are "independently owned and operated and which [are] not dominant in [their] filed of operation." *Id.* § 632(a)(1); *see also id.* § 1691c-2(h)(2).

49.     Section 1071 adopts the same definition of "credit" that was already articulated in ECOA. *See* Dodd-Frank § 1071(a) (adding Section 1071 to ECOA, i.e., subchapter IV of title 15); 15 U.S.C. § 1691a(a) & (d) (defining "credit" "for the purpose of … subchapter [IV of title 15]").

50.     In other words, Section 1071's obligations—and the CFPB's authority to implement that section—do not extend beyond ECOA's preexisting understanding of "credit," *i.e.*, situations involving the right to defer the payment of a debt.

51.     Section 1071 also repeatedly uses the term "loan" in a manner that informs and limits the meaning of "credit."

52.     For example, Section 1071 is titled "[s]mall business *loan* data collection," 15 U.S.C. § 1691c-2 (emphasis added), and it requires covered financial institutions to "compile and maintain … a record of the information provided by any *loan* applicant," *id.* § 1691c-2(e)(1) (emphasis added)).

### III.   CFPB's Section 1071 Rulemaking

#### A.   The CFPB Gathered No Cost Data Specific to Sales-Based Financing Providers Before Section 1071's Implementation.

53.   During the decade following Dodd-Frank's enactment, and in anticipation of a rule that would implement Section 1071, the CFPB gathered information about small business financing in the United States.

54.   These efforts included requests for information,[4] a symposium on Section 1071's implementation,[5] the convening of a Small Business Advisory Review Panel pursuant to the Small Business Regulatory Enforcement Fairness Act of 1966 ("SBREFA Panel"),[6] a survey of one-time costs of compliance,[7] and other stakeholder outreach.

55.   However, during this period, the CFPB stated that it did not plan to "cover … merchant cash advances" under the eventual Section 1071 rule.[8]

56.   As a result, the Bureau collected little to no data on the costs that would be imposed on sales-based financing providers and small businesses using sales-

---

[4] *See* 82 Fed. Reg. 22,318 (May 15, 2017); 85 Fed. Reg. 46,600 (Aug. 3, 2020).

[5] *See* CFPB, *Symposium: Section 1071 of the Dodd-Frank Act* (Nov. 6, 2019), https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.

[6] *See* CFPB, *Small Business Advisory Review Panel for Potential Small Business Lending Data Collection Rulemaking*, https://www.consumerfinance.gov/rules-policy/small-business-review-panels/potential-small-business-lending-data-collection-rulemaking/ (accessed Dec. 21, 2023).

[7] *See* CFPB, *Small Business Lending Rulemaking*, https://www.consumerfinance.gov/1071-rule/ (accessed Dec. 21, 2023).

[8] CFPB, Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking 8 (2020), https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf.

based financing in the event that sales-based financing was to become subject to regulation under Section 1071.

**B.      The Proposed Section 1071 Rule**

57.      In late 2021, the Bureau published a notice of, and requested public comment on, proposed regulations implementing Section 1071.  *See* Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B), 86 Fed. Reg. 56,356 (Oct. 8, 2021) ("Proposed Rule").

58.      The Proposed Rule would effectuate Section 1071 by requiring the collection of various types of data related to small business credit applications.  *See id.* at 56,356–57.

59.      The agency claimed that the Proposed Rule would not change the "existing definition of credit" as a way of "foster[ing] consistency with existing Regulation B."  *Id.* at 56,392.

60.      Under that existing definition, the CFPB had never previously considered sales-based financing to be "credit," and as just discussed, the Bureau had explicitly stated that it planned *not* to subject sales-based financing to regulation as "credit" under the Section 1071 rule.

61.      But in the Proposed Rule, the Bureau pivoted.  It proposed a more "*expansive* product coverage to adequately capture small businesses' experiences with obtaining financing" by treating sales-based financing as a type of "credit" "within the scope of this Proposed Rule."  *Id.* at 56,357, 56,403–04 (emphasis added).

62.      As to the actual meaning of "credit," the agency thought that "the statutory term … in ECOA is ambiguous as to whether it covers sales-based financing

15

products like [sales-based financing]" and that "existing Regulation B offers no further clarity." *Id.* at 56,406.  Based on the agency's mistaken view that sales-based financing involves "the right to defer repayment … over time," and mistaken conclusion that sales-based financing transactions are "underwritten and function like a typical loan," the CFPB thought it was a "better reading of the term 'credit'" to "encompas[s] [sales-based financing]." *Id.*

63.   The Bureau also included sales-based financing in the Proposed Rule because it thought doing so would avoid "disproportionately burden[ing] … lenders who do not offer such products" by "creat[ing] a more level playing field across financial institutions that provide cash flow financing to small businesses." *Id.* at 56,404, 56,406.  The Bureau also expressed concern that excluding sales-based financing from the rulemaking "would create unequal regulatory burdens for *entities that may compete* for the same small business clients." *Id.* at 56,405 (emphasis added).  Unsurprisingly, those advocating for treating sales-based financing as "credit" were not sales-based financing providers.

64.   Under the Proposed Rule, many types of financing similar to sales-based financing—including factoring, leases, and trade credit—would not be considered credit.  *See id.* at 56,358.

65.   Interested parties could submit comments on this and other aspects of the Proposed Rule through January 6, 2022.  *Id.* at 56,356.

### C.   RBFC Comments on the Proposed Rule

66.   Because the Proposed Rule would subject RBFC's members who provide sales-based financing to Section 1071 collection and reporting obligations, RBFC

submitted extensive comments on its members' behalf.  *See* RBFC, Comment Letter on Proposed Rulemaking on Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) (Jan. 6, 2022), https://www.regulations.gov/comment/CFPB-2021-0015-1719 ("Comment Letter") (attached as Exhibit A).

67.    RBFC advanced multiple points in its Comment Letter that are relevant to this action.

### 1.    Sales-Based Financing Is Not "Credit" Under ECOA.

68.    RBFC explained that under ECOA, "credit" refers to "the right … to defer the payment of debt." *Id.* at 3–4.

69.    Sales-based financing, however, is not credit because it does not involve the *deferral* of a payment obligation.  Rather, sales-based financing involves a substantially contemporaneous exchange of value whereby the sales-based financing provider "purchase[s] the right to a specific portion of a merchant's future proceeds, up to an agreed-upon limit." *Id.* at 4.

70.    RBFC also pointed out that while the plain meaning of "debt"—a term that is included in the definition of "credit"—connotes a liability or obligation to repay a certain sum of money, sales-based financing generally involves "*no* liability or obligation to make payment where future receipts do not materialize." *Id.* at 4–5.

71.    RBFC explained that Section 1071 applies to the collection of "*loan* data," and that sales-based financing transactions are not loans.  Like debt, a loan typically involves an absolute obligation to repay a specific amount.  Sales-based financing, by contrast, does not involve an absolute obligation to repay, and sales-

based financing providers bear the risk of the recipient's business failing.  *Id.* at 6–8; *see supra* Section I.  RBFC pointed out that sales-based financing transactions "also lack other signature characteristics of loans, including interest rates and finite payment timelines."  *Id.* at 6.

### 2. Benefitting Sales-Based Financing Competitors Is Not a Permissible Statutory Purpose.

72.     RBFC also highlighted the Proposed Rule's impermissible focus on benefitting sales-based financing competitors.

73.     The Proposed Rule justified sales-based financing inclusion, in part, to "create a more level playing field across financial institutions that provide cash flow financing to small businesses."  86 Fed. Reg. at 56,406.

74.     RBFC also explained that ECOA limits the purpose of regulations under Section 1071 to "facilitat[ing] enforcement of fair lending laws" and identifying small business needs.  Comment Letter at 19.  Those purposes do not, however, include the Bureau's justification for regulating sales-based financing providers to benefit their competitors.  *Id.*

### 3. Treating Sales-Based Financing as Credit Would Harm Small Businesses by Imposing Heavy Costs on Sales-Based Financing.

75.     Although the Proposed Rule recognized some benefits from sales-based financing, RBFC underscored these and more: sales-based financing is faster, more flexible, and simpler to obtain than loans; sales-based financing generally has higher approval rates; sales-based financing is available in smaller amounts than traditional

forms of financing; and sales-based financing is more accessible for small businesses who may have difficulty obtaining credit. *Id.* at 15.

76.     RBFC also pointed to the many costs sales-based financing providers would incur if sales-based financing were regulated as "credit" under the Section 1071 rule:  Sales-based financing providers would need to undergo costly programming upgrades and adjustments, including hiring more employees to collect and report the data required by Section 1071.  Sales-based financing providers would necessarily incur these and other additional costs as tracking such data "is simply not something the industry has ever done." *Id.* at 16.

77.     For small sales-based financing providers in particular, RBFC pointed out that "[t]hese burdensome costs" could "potentially forc[e] them to leave the industry altogether." *Id.* at 16, 18.

78.     RBFC further explained how imposing Section 1071 collection and reporting obligations on sales-based financing providers would create costs ultimately borne by small businesses that rely on sales-based financing. *Id.* at 16.

79.     The increased obligations could delay the application process and limit small businesses' ability to obtain urgent financing; higher financing costs would pass through to the small businesses that Section 1071 is designed to benefit; and small businesses would ultimately lose access to a critical form of financing if sales-based financing providers were unable to remain in the market. *Id.* at 16–18.

80.     RBFC relatedly explained that the Bureau had failed to appreciate the costs to sales-based financing providers, in part, because the data it relied on was inadequate.  *See id.* at 17–18.

81.     The Bureau had largely relied on a One-Time Cost Survey in 2020 to justify the cost assumptions undergirding the Proposed Rule.  *See id.* at 20; *see also* Proposed Rule at 56,547–48.  In this survey, the Bureau sought voluntary responses detailing the "one-time costs to prepare to collect and report data."  86 Fed. Reg. at 56,377.

82.     Yet, as RBFC pointed out, the CFPB was proposing *not* to cover sales-based financing at the time of the survey, and sales-based financing providers had never been regulated under ECOA or Section 1071.  As such, there was no reason for sales-based financing providers to respond to the survey, nor was it clear whether the Bureau had solicited any responses from sales-based financing providers.  *See* Comment Letter at 21.

83.     Accordingly, RBFC expressed concern that "the Bureau lacks any cost data whatsoever for [sales-based financing]."  *Id.*

**D.     The Final Rule**

84.     On May 31, 2023, the Bureau published its final rule implementing Section 1071.  *See* Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35,150 ("Final Rule").

85.     For purposes of this action, the Final Rule did not materially differ from the Proposed Rule.

86.     Under the Final Rule, "covered financial institutions" must collect and report specific data related to "small business" applications for "covered credit transactions." *Id.* at 35,151.

87.     The Final Rule defines "covered financial institution" as a financial institution "that originated at least 100 covered credit transactions for small business in each of the two preceding calendar years." *Id.* at 35,329 (codified at 12 C.F.R. § 1002.105(b)).

88.     The Final Rule also defines "covered credit transactions" as one "that meets the definition of … *credit* under existing Regulation B," *id.* at 35,151 (emphasis added), *i.e.*, "a right … to defer payment of a debt," 12 C.F.R. § 1002.2(j); *see also* Final Rule at 35,352 (codified at 12 C.F.R. § 1002.104) (defining "covered credit transaction" as "an extension of credit that is not" a trade credit, home mortgage, insurance premium financing, public utilities credit, securities credit, or incidental credit).

89.     The Final Rule also explains that "a business is a small business if its gross annual revenue for its preceding fiscal year is $5 million or less," with inflation-indexed adjustments to that threshold every five years as needed.  Final Rule at 35,258 (codified at 12 C.F.R. § 1002.106(b)).

90.     Despite RBFC's Comment Letter, the Final Rule treats sales-based financing as "credit transactions … within the scope of the rule."  Final Rule at 35,151; *see also id.* at 35,220 & n.359 (explaining that merchant cash advances fall with "an umbrella term often referred to as 'sales-based financing,' and explaining that all sales-based financing products "are covered by the definition of 'credit'").

91.    The Final Rule considers sales-based financing to be a type of "credit" even while acknowledging that sales-based financing does *not* generally fall within the scope of state lending laws.  *See id.* 35,220.

92.    The Bureau rejected RBFC's comments regarding the statutory meaning of "credit" because, "based on [the Bureau's] review of typical [sales-based financing] arrangements and its expertise," it thought sales-based financing involved a deferred payment obligation rather than a "substantially contemporaneous exchange of value."  *Id.* at 35,223.

93.    The agency's policy justifications for doing so mirrored the Proposed Rule.  *See id.* at 35,223–24.  The Bureau placed great emphasis, for example, on the fact that sales-based financing represents a burgeoning market not covered by existing regulations—suggesting that the absence of regulation was itself a justification for the Final Rule's expansive approach.  *See id.* 35,220.

94.    These policy justifications also continued to include the Bureau's "belie[f] that including [sales-based financing] will create a more level playing field across financial institutions."  Final Rule at 35,224.  Yet the Final Rule neither acknowledged nor responded to RBFC's comments that competitor benefit is an impermissible statutory purpose under ECOA.

95.    The Bureau did briefly recognize RBFC's concerns that "covering merchant cash advances is contrary to public policy because doing so will negatively impact access to financing and because [sales-based financing] benefit business."

22

Final Rule at 35,222.  But the Final Rule did not grapple with or even address those concerns.

96.     The Final Rule also did not address RBFC's request for clarification as to whether the One-Time Cost Survey (and thus the Final Rule's cost-benefit projections) included data from sales-based financing providers.

97.     The Final Rule took effect on August 29, 2023, *id.* at 35,533, though it was subsequently enjoined, *see infra* section III.E.  The Final Rule has staggered compliance deadlines.  Specifically, financial institutions originating 2,500, 500, and 100 covered credit transactions during the last two years must begin to comply with the Final Rule by October 1, 2024, April 1, 2025, and January 1, 2026, respectively. *See id.*

### E.     Subsequent Litigation

98.     The Final Rule has since been preliminarily enjoined by two federal district courts.

99.     In the Southern District of Texas, a group of banking organizations and one Texas bank secured a preliminary injunction against the Final Rule's enforcement because they were likely to succeed on the merits of their claim that the CFPB's funding structure was unconstitutional.  *See Tex. Bankers*, No. 7:23-cv-00144 (S.D. Tex. July 31, 2023) (order granting preliminary injunction in part and denying in part).  The district court initially granted relief only as to the plaintiffs and their members.  Several parties intervened and requested that the district court expand the scope of the injunction to include non-parties.  The district court granted that request, enjoining the Bureau from enforcing the Final Rule against "all covered

financial institutions." *See Tex. Bankers*, No. 7:23-cv-00144 (S.D. Tex. Oct. 26, 2023) (emphasis added).

100.   In the Eastern District of Kentucky, a similar coalition of Kentucky-based plaintiffs secured a nationwide preliminary injunction that was not limited to the parties before the court. *See Monticello Banking Co.*, No. 6:23-cv-00148 (E.D. Ky. Sept. 14, 2023).

101.   However, the injunctions in *Texas Bankers* and *Monticello Banking* will ultimately dissolve if the Supreme Court issues its decision in *CFSA* in favor of the CFPB. *See supra* ¶ 44. The *Texas Bankers* injunction requires that if the Supreme Court rules for the CFPB in *CFSA*, the Final Rule's implementation deadlines must extend to compensate for the duration of the preliminary injunction.

102.   RBFC brings this suit to adequately represent its own interests (and thus the interests of its members) on the merits of its claims. Those include claims that are specific to sales-based financing and that are independent of the constitutional claim that supports the preliminary injunctions in *Texas Bankers* and *Monticello Banking*.

## IV.   RBFC's Members Will Be Subject to the Final Rule

103.   Although the Final Rule does not obligate RBFC's members to comply until October 2024 at the earliest, its members have already begun incurring substantial costs in preparation for the scheduled compliance deadlines.

104.   For example, RBFC member Everest Business Funding ("Everest") is directly impacted by the Final Rule.

105.   Everest provides sales-based financing to a host of small businesses as defined under ECOA.  *See* 15 U.S.C. § 632(a) (defining "small business concern" to be any business that is "independently owned and operated and which is not dominant in its field of operation"); 12 C.F.R. § 1002.106(b)(1) (further defining "small business" as a business with "gross annual revenue … for its preceding fiscal year [at] $5 million or less").

106.   As noted above, the CFPB has determined that sales-based financing transactions are "covered credit transactions" within the meaning of the Final Rule.

107.   Because Everest originated at least 100 "covered credit transactions" for small businesses during the two preceding calendar years, it is a "covered financial institution" under the Final Rule and thus subject to the Rule's information collection and reporting obligations.  *See* 12 C.F.R. § 1002.105(b).

108.   And because Everest originated over 2,500 "covered credit transactions" for small businesses during the preceding two calendar years, it will be subject to and must comply with the Final Rule by October 1, 2024, absent judicial relief.  *See* Final Rule at 35,150.

109.   Everest has also already incurred and will incur significant costs as a result of the Final Rule, including but not limited to costly programming upgrades, acquiring new computer software systems, and training existing and/or newly hired employees to handle reporting and auditing requirements.  *See also* Comment Letter at 16.

## CLAIMS

### Count I: Violation of APA, 5 U.S.C. § 706(2)(C)
*(Final Rule Is Contrary to Law Because Sales-Based Financing Is Not "Credit" Under Statute's Definition)*

110.    RBFC incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

111.    Section 1071 imposes certain data collection and reporting requirements for "any application to a financial institution for *credit* for women-owned, minority-owned, or small business." 15 U.S.C. § 1691c-2(b) (emphasis added).

112.    ECOA supplies the relevant definition of "credit." It defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." *Id.* § 1691a(d).

113.    The text, structure, history, and purpose of Section 1071 confirm that sales-based financing does not qualify as "credit" within the meaning of the statute.

114.    *First*, by its plain terms, ECOA's definition of "credit" applies only where there exists a right to "defer" a payment obligation. But sales-based financing involves a substantially contemporaneous exchange of value—*i.e.*, rights to a percentage of revenue generated by a business's sale of goods and services in exchange for the sales-based financing provider's lump sum payment. *See Shaumyan v. Sidetex Co.*, 900 F.2d 16, 18 (2d Cir. 1990) (explaining definition of "credit" under ECOA).

115.    *Second*, ECOA's definition of "credit" repeatedly uses the term "debt" to describe the payment obligation that has been deferred. *See* 15 U.S.C. § 1691a(d).

26

Even if sales-based financing involved deferred payment obligations, it does not involve "debt." Prior to ECOA's enactment and through today, "debt" has ordinarily referred to an enforceable liability for a fixed sum. *See, e.g.*, Black's Law Dictionary (4th ed. 1968) ("A sum of money due by certain and express agreement … where the amount is fixed and specific, and does not depend on any subsequent valuation to settle it."). Sales-based financing transactions do not create "debt" because they impose no unconditional obligation to repay and no liability where future receipts do not materialize in the ordinary course of business.

116. *Third*, Section 1071 applies only in the context of "[s]mall business *loan* data collection," 15 U.S.C. § 1691c (emphasis added), and it repeatedly uses "loan" in a manner that informs the meaning of "credit," *see, e.g.*, *id.* at § 1691c-2(e)(1) (requiring covered financial institutions to "compile and maintain … a record of the information provided by any *loan* applicant" (emphasis added)). Sales-based financing transactions are not "loans" because the provider bears the risk of business failure, and there are no interest rates or finite payment timelines. Indeed, the Bureau acknowledged that sales-based financing is generally not covered under state lending laws. *See supra* ¶ 91.

117. Even though sales-based financing is not "credit" or "loans" within the meaning of Section 1071, the Bureau purported to regulate sales-based financing as "credit" under the Final Rule.

118.    The Bureau reasoned that "the statutory term 'credit' in ECOA is intentionally broad so as to include a wide variety of products," including sales-based financing.  Final Rule at 35,223.

119.    The Bureau determined that "merchant cash advances and other sales-based financing are covered by the definition of 'credit'" in the Final Rule, while, at the same time, it expressly excluded factoring.  Final Rule at 35,223 (citing 12 C.F.R. § 1002.102(i) & 35,542).  That definition merely incorporates the definition of "credit" in Regulation B, 12 C.F.R. § 1002.2(j), which in turn mirrors the definition of "credit" in ECOA, 15 U.S.C. § 1691a(d).

120.    Because sales-based financing is not "credit" within the meaning of ECOA or Section 1071, the Bureau lacked the statutory authority to regulate sales-based financing as "credit" under the Final Rule.  *See supra* ¶¶ 25–33, 68–71.

121.    The Court should therefore declare that the Final Rule is invalid and set the Rule aside to the extent that it purports to apply to sales-based financing. *See* 5 U.S.C. § 706(2)(C) (court "shall … hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

### Count II: Violations of APA, 5 U.S.C. § 706(2)(A)
*(CFPB Based Rule on Improper Purpose, Failed to Consider Policy Downsides and Costs to Sales-Based Financing Regulation, and Failed to Respond to Material Comments )*

122.    RBFC incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

123.   The Court must "hold unlawful and set aside agency action" that is "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).  The Final Rule is arbitrary and capricious in multiple respects.

124.   *First*, the Final Rule is arbitrary and capricious because the Bureau relied on improper factors to justify its Rule.  The Bureau brought sales-based financing within the scope of the Rule to "level the playing field" between sales-based financing providers and their competitors.  *See supra* ¶¶ 63, 94.  Similarly, the Bureau justified its decision to regulate sales-based financing in part because it viewed that market as largely unregulated when compared to other financial products.  *See supra* ¶ 93.  But ECOA and Section 1071 were enacted to "facilitate enforcement of fair lending laws" and to ease access to credit, 15 U.S.C. § 1691c-2(a)— not to bolster entrenched interests by handicapping innovative providers of capital to small businesses.  Because imposing regulation in order to benefit industry competitors is not a "facto[r] which Congress … intended [the agency] to consider," the Final Rule is arbitrary and capricious.  *E.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.* Ins. Co., 463 U.S. 29, 43 (1983).

125.   *Second*, the Final Rule is arbitrary and capricious because the Bureau failed to adequately consider costs and benefits.  For example, the Bureau failed to collect adequate cost data to estimate the economic impact of applying the Final Rule to sales-based financing, estimating one-time costs using a survey that yielded usable data from only *seven* non-depository institutions, *none* of which were sales-based financing providers.  That is far from sufficient given the Bureau's estimate that

"about 70 merchant cash advance providers" would be covered by the Final Rule. *See* Final Rule at 35,495.

126.    *Third*, the Final Rule is arbitrary and capricious because the Bureau failed to respond to many of RBFC's material comments. *See Sierra Club v. EPA*, 863 F.3d 834, 838 (D.C. Cir. 2017) ("[I]n APA review, we will often find agency decisions arbitrary or capricious where the agency has failed to respond to major substantive comments."). For example, although the Bureau acknowledged RBFC's comments highlighting the many unique benefits of sales-based financing and warning of the heavy costs small businesses would ultimately bear, the Bureau never attempted to *address* those concerns or to *weigh* the serious costs of subjecting sales-based financing to regulation under Section 1071. *See supra* ¶¶ 75–79, 95.

127.    The Court should therefore declare that the Final Rule is invalid and set the Rule aside to the extent that it purports to apply to sales-based financing. *See* 5 U.S.C. § 706(2)(A) (court "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

### Count III: Violation of U.S. Const. Art. I, § 9
### *(CFPB's Funding Structure Violates the Appropriations Clause)*

128.    RBFC incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

129.    The Appropriations Clause of the U.S. Constitution provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., Art. I, § 9, cl. 7.

130.    The Appropriations Clause's "straightforward and explicit command" ensures Congress's exclusive power over the federal purse.  *OPM v. Richmond*, 496 U.S. 414, 424 (1990).  It guarantees that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 425.

131.    The CFPB's "self-actualizing, perpetual funding mechanism" violates that requirement.  *CFSA*, 51 F.4th at 638.

132.    Rather than relying on annual appropriations for funding like most executive agencies, the Bureau "receives funding … outside the appropriations process through bank assessments," *Seila Law*, 140 S. Ct. at 2194, by requisitioning from the Federal Reserve any amount "determined by the [CFPB] Director to be reasonably necessary to carry out" the Bureau's functions, as long as that amount does not exceed 12 percent of the Federal Reserve's "total operating expenses." 12 U.S.C. § 5497(a)(1)–(2).

133.    Because the funding employed by the CFPB to promulgate the Final Rule was drawn through the Bureau's unconstitutional funding scheme, the Rule is "contrary to constitutional right, power, [or] privilege" and must be held "unlawful and set aside." 5 U.S.C. § 706(2)(B); *see also CFSA*, 51 F.4th at 643 (vacating the CFPB's Payday Lending Rule "as the product of the Bureau's unconstitutional funding scheme").

## **PRAYER FOR RELIEF**

WHEREFORE, RBFC respectfully requests that the Court issue judgment in its favor and against Defendants and grant the following relief:

A.      Declare that the Final Rule is invalid and set aside the Rule as applied to sales-based financing because the Rule is contrary to the governing statute, arbitrary and capricious, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706, to the extent that it purports to regulate sales-based financing;

B.      Declare that the Final Rule is invalid and set aside the Rule because it was promulgated using funding that violated the Constitution's Appropriations Clause;

C.      Grant Plaintiff recovery of its fees, costs, and expenses incurred in connection with this litigation, as authorized by 28 U.S.C. § 2412;

D.      Award such other relief as the Court deems just and proper.

December 26, 2023

Kevin F. King*
Daniel G. Randolph*
MaKade C. Claypool*
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000
Fax: (202) 662-6291
kking@cov.com

Respectfully submitted,

*/s/ Paul F. Hancock*
Paul F. Hancock
paul.hancock@klgates.com
Florida Bar No. 140619
Mallory M. Cooney
mallory.cooney@klgates.com
Florida Bar No. 125659
K&L GATES LLP
200 S. Biscayne Boulevard, Suite 3900
Miami, FL 33131-2399
Telephone:  (305) 539-3300
Facsimile: (305) 358-7095

*Counsel for Plaintiff*
*Revenue Based Finance Coalition*

* *pro hac vice* applications forthcoming