# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

REVENUE BASED FINANCE
COALITION,

        *Plaintiff*,

   *v.*

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

        *Defendants*.

Civil Action No. 1:23-cv-24882-DSL

Judge David S. Leibowitz
Magistrate Judge Eduardo I. Sanchez

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................. ii

INTRODUCTION .............................................................................................................................. 1

BACKGROUND ................................................................................................................................ 2

    A.   Section 1071.............................................................................................................. 2
    B.   Merchant Cash Advances ......................................................................................... 3
    C.   The Bureau's Small Business Lending Rule ............................................................. 6
    D.   This Litigation.......................................................................................................... 8

STANDARD OF REVIEW .............................................................................................................. 8

ARGUMENT ..................................................................................................................................... 9

I. Merchant cash advances are "credit" subject to ECOA. .......................................................... 9

    a.   Merchant cash advance providers grant merchants the right to defer payment........... 10
    b.   Merchant cash advances involve "debts" owed by the merchant to the provider. ....... 14
        i. Merchant cash advances involve the creation of "debt" as that term is employed in ordinary usage, dictionaries, and other statutes. ........................................................... 15
        ii. Whether an obligation to pay is a "debt" does not turn on whether the obligation is contingent or whether the lender has recourse against the borrower........................... 16
    c.   Section 1071's data requirements apply to all forms of "credit" under ECOA, including merchant cash advances. ................................................................................................ 18

II. The Bureau's decision not to exempt merchant cash advances from the Rule's coverage was reasonable and consistent with the statute ................................................................................... 20

    a.   The Bureau reasonably concluded that not excluding merchant cash advances furthers Section 1071's fair lending and business and community development purposes. .............. 21
    b.   The Bureau did not rely on any impermissible factor when it recognized that a rule covering more forms of credit would shed greater light on the small business lending market. ............................................................................................................................. 23
    c.   The Bureau reasonably considered all relevant comments........................................... 25
        i. The Bureau reasonably considered policy implications of the Rule ......................... 26
        ii. The Bureau reasonably considered comments about its cost analysis ..................... 28
        iii. The Bureau reasonably considered merchant cash advance providers' putative "reliance" on not being regulated .................................................................................. 33

III. The Bureau's statutory funding mechanism provides no grounds for setting aside the Rule. 35

CONCLUSION................................................................................................................................. 35

i

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Bennett v. Donovan,*
   703 F.3d 582 (D.C. Cir. 2013) ............................................................................ 17

*CFPB v. Law Offices of Crystal Moroney,*
   63 F.4th 174 (2d Cir. 2023) ................................................................................. 35

*Chevron v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ................................................................................. 8, 9, 10

*Christopher v. SmithKline Beecham Corp.,*
   567 U.S. 142 (2012) ........................................................................................ 34

*C.I.R. v. Tufts,*
   461 U.S. 300 (1983) ........................................................................................ 17

*City of N. Miami v. Fed. Aviation Admin.,*
   47 F.4th 1257 (11th Cir. 2022) ........................................................................... 9

*Cmty. Fin. Servs. Ass'n of Am., Ltd., v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) .............................................................................. 35

*Coker v. JPMorgan Chase Bank, N.A.,*
   364 P.3d 176 (Cal. 2016) .................................................................................. 17

*Cox v. Cmty. Loans of Am., Inc.,*
   2014 WL 1216511 (M.D. Ga. Mar. 24, 2014) ...................................................... 17

*eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.,*
   519 F. Supp. 3d 1129 (S.D. Fla. 2021) ............................................................... 12

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................................ 34

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ......................................................................... 9, 27, 29, 30

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC,*
   2022 WL 1997207 (S.D.N.Y. June 6, 2022) ....................................................... 20

*Haymount Urgent Care PC v. GoFund Advance, LLC,*
   609 F. Supp. 3d 237 (S.D.N.Y. 2022) ........................................................... 19, 20

*In re GMI Grp., Inc.,*
   606 B.R. 467 (Bankr. N.D. Ga. 2019) ................................................................. 19

ii

*In re Kedrowski,*
    284 B.R. 439 (Bankr. W.D. Wis. 2002)....................................................................... 11

*In re Marriage of Grubb,*
    745 P.2d 661 (Colo. 1987)........................................................................................... 11

*In re Saylors,*
    869 F.2d 1434 (11th Cir. 1989) .................................................................................. 17

*Lapham v. Walgreen Co.,*
    88 F.4th 879 (11th Cir. 2023) ............................................................................. 8, 9, 10

*Lateral Recovery LLC v. Queen Funding, LLC,*
    2022 WL 2829913 (S.D.N.Y. July 20, 2022) ............................................................ 20

*LG Funding, LLC v. United Senior Properties of Olathe, LLC,*
    181 A.D.3d 664 (N.Y. App. Div. 2020) .................................................................... 20

*Liberty Leasing Co. v. Machamer,*
    6 F. Supp. 2d 714 (S.D. Ohio 1998) ......................................................................... 18

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007).................................................................................................... 34

*Sierra Club v. Van Antwerp,*
    526 F.3d 1353 (11th Cir. 2008) .................................................................................... 9

*Solnes v. Wallis & Wallis, P.A.,*
    15 F. Supp. 3d 1258 (S.D. Fla 2014) ........................................................................... 9

*Sullivan v. Everhart,*
    494 U.S. 83 (1990)........................................................................................................ 9

*SureTec Ins. Co. v. Nat'l Concrete Structures, Inc.,*
    2012 WL 12860161 (S.D. Fla. July 3, 2012)............................................................. 14

*Ulico Cas. Co. v. Superior Mgmt. Servs., Inc.,*
    89 F. App'x 278 (D.C. Cir. 2004)............................................................................... 14

*VHV Jewelers, LLC v. Wolf,*
    17 F.4th 109 (11th Cir. 2021) ....................................................................................... 9

*Western Group Nurseries, Inc. v. Ergas,*
    167 F.3d 1354 (11th Cir. 1999) .................................................................................. 17

**Statutes**

11 U.S.C. § 101(12) ............................................................................................................ 15

11 U.S.C. § 101(5)(A), (B) ........................................................................................... 15

12 U.S.C. § 2801 ............................................................................................................. 2

12 U.S.C. § 5497 ........................................................................................................... 35

12 U.S.C. § 5512(b)(2)(A)(i) ....................................................................................... 28

12 U.S.C. § 5519 ........................................................................................................... 20

15 U.S.C. § 1602(f) ....................................................................................................... 16

15 U.S.C. § 1691(a) ....................................................................................................... 18

15 U.S.C. § 1691a(d) ............................................................................................... *passim*

15 U.S.C. § 1691c-2 ........................................................................................................ 2

15 U.S.C. § 1691c-2(a) ........................................................................................ 2, 19, 34

15 U.S.C. § 1691c-2(b) ............................................................................................... 3, 24

15 U.S.C. § 1691c-2(b)(1) .......................................................................................... 3, 18

15 U.S.C. § 1691c-2(e)(2)(A)-(G) ................................................................................. 3

15 U.S.C. § 1691c-2(e)(2)(H) ........................................................................................ 3

15 U.S.C. § 1691c-2(f)(1) ............................................................................................... 3

15 U.S.C. § 1691c-2(f)(2)-(3) ......................................................................................... 3

15 U.S.C. § 1691c-2(g)(1) .............................................................................................. 3

15 U.S.C. § 1691c-2(g)(2) ................................................................................... 3, 20, 24

15 U.S.C. § 1692a(5) .................................................................................................... 15

Pub. L. 111-203, 124 Stat. 1367 (2010) ......................................................................... 2

**Regulations**

12 C.F.R. § 1024.41 ...................................................................................................... 16

12 C.F.R. § 1026.33(a) .................................................................................................. 16

34 C.F.R. § 685.209 ...................................................................................................... 16

34 C.F.R. § 685.213 ...................................................................................................... 16

34 C.F.R. § 685.214 ...................................................................................................... 16

34 C.F.R. § 685.219 ...................................................................................................... 16

34 C.F.R. § 685.221 ...................................................................................................... 16

Small Business Lending Data Collection Under the Equal Credit Opportunity Act
    (Regulation B), Proposed Rule,
    86 Fed. Reg. 56,356 (Oct. 8, 2021) ........................................................................ 7

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule,
    88 Fed. Reg. 35,150 (May 31, 2023) ....................................................................... 1

## Other Authorities

*Black's Law Dictionary* (11th ed. 2019) ....................................................................... 15

Fannie Mae, *Fannie Mae Flex Modification* (last visited Apr. 12, 2024) ..................................... 16

*Merriam-Webster.com Dictionary*, Merriam- Webster (last visited Apr. 12, 2024) .................. 15

*Oxford English Dictionary* (2d ed. 1989) ....................................................................... 15

S. Rep. No. 111-176 (2010) ......................................................................................... 2

**INTRODUCTION**

In 2010, Congress amended the Equal Credit Opportunity Act (ECOA) to require financial institutions to collect and report data regarding applications for credit for small businesses. It adopted the amendments for the dual purposes of enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of small businesses, and facilitating fair lending enforcement. The statute requires the Consumer Financial Protection Bureau to "prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section." Pursuant to this requirement, the Bureau in 2023 published a rule titled "Small Business Lending Under the Equal Credit Opportunity Act."

The statute covers applications for "credit," defined in relevant part as "the right granted by a creditor to a debtor . . . to incur debts and defer its payment[.]" 15 U.S.C. § 1691a(d). Merchant cash advances (MCAs), a form of financing that purports to exchange an up-front cash lump sum for future payments out of a merchant's proceeds from future sales of goods or services, fall within the statutory definition because they create debts that merchants repay over time. The Bureau reasonably declined to exclude MCAs from coverage under the Rule, given the lack of transparency into the MCA market and MCA products, concerns about high costs and predatory practices, and MCAs' increasing prevalence among minority business owners. In light of this information, the Bureau reasonably determined that "inclusion of MCAs in the . . . Rule is important to fulfilling both the fair lending and the business and community development purposes of section 1071." Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35,150, 35,223-24 (May 31, 2023) (hereinafter cited to in the administrative record); A.R. 74-75. That conclusion was reasonable and well-supported by the rulemaking record.

1

Plaintiff, a trade association representing MCA providers, now challenges that reasonable conclusion. Plaintiff argues that these financing arrangements are not "credit," that the Bureau acted arbitrarily and capriciously by not acting to exclude MCAs from the scope of the Rule, and that the Rule is unlawful because the Bureau failed to respond adequately to material comments. Plaintiff is mistaken on all counts. The Court should grant summary judgment for the Bureau.

## BACKGROUND

### A.  Section 1071

Congress passed the Consumer Financial Protection Act of 2010 (CFPA) as part of "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176, at 2 (2010). That crisis and its aftermath disproportionately affected small businesses and lending to small businesses (just as, more recently, both were again hit hard by the COVID-19 pandemic). *See* A.R. 4-5. Yet data about the small business lending market have historically been fragmented and incomplete, making it difficult to assess and respond to dynamics in the market. A.R. 7-8.

Section 1071 of the CFPA addresses this issue by amending ECOA to create a system for collecting and publishing information about lending to small businesses. Pub. L. 111-203, § 1071, 124 Stat. 1367, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). That approach mirrors in key respects that of the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. § 2801 *et seq.*, which for decades has shed valuable light on mortgage markets by requiring lenders to report transaction-level information about mortgage applications and loans. Section 1071's express purposes are to (1) "facilitate enforcement of fair lending laws" and to (2) "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c-2(a).

In Section 1071, Congress required financial institutions to gather certain information about their small business lending upon "any application to a financial institution for credit" by a small business. 15 U.S.C. § 1691c-2(b). Specifically, the statute directs financial institutions to "inquire whether the business is a women-owned, minority-owned, or small business." *Id.* § 1691c-2(b)(1). It further requires financial institutions to compile a series of additional specified data points, *id.* § 1691c-2(e)(2)(A)-(G), plus "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]," *id.* § 1691c-2(e)(2)(H).

The statute directs financial institutions to submit the data they compile to the Bureau each year, *id.* § 1691c-2(f)(1), and requires the Bureau to publish it, *id.* § 1691c-2(f)(2)-(3). The statute also requires the Bureau to issue rules and guidance to implement Section 1071, *id.* § 1691c-2(g)(1), and authorizes the Bureau to adopt such exceptions and exemptions from the statutory requirements "as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]," *id.* § 1691c-2(g)(2).

## B. Merchant Cash Advances

MCAs are a form of financing for small businesses that purport to be structured as a sale of future income. A.R. 71.[1] Under a typical MCA, a merchant receives a lump sum of cash and promises to repay it plus an additional amount. *Id*. MCA agreements are structured to impose a repayment obligation on the small business until the full balance owed to the MCA provider is paid. The merchant promises to repay by pledging a percentage of its future revenue, which is

---

[1] Consistent with the Rule's preamble, this brief generally uses the term "merchant cash advance" to describe the product at issue here and that is covered by the Rule. *See*, *e.g.*, A.R. 71 (describing MCAs). Plaintiff's motion generally refers to "sales-based financing." The Bureau understands Plaintiff to mean to refer to the same product the Bureau is calling MCAs. To the extent that Plaintiff seeks to challenge the Rule's coverage of some *other* product, it would not be entitled to summary judgment with respect to a product that its motion does not even define.

3

often paid via a fixed daily withdrawal until the agreed-upon payment amount is satisfied. For providers that purport to charge a percentage of future revenues, the typical holdback percentage is between 10 to 20 percent of gross receipts or revenues—a significant amount for already cash-strapped small businesses. A.R. 72. The merchant typically repays over 3 to 12 months. A.R. 74.

MCA contracts in the record provide examples of how the agreements can operate. A number of these contracts require merchants to deposit revenues into a specific bank account that the MCA provider then debits daily via pre-authorized ACH (an electronic transfer of funds) for a "fixed daily payment" until a "specified amount" in cumulative payments is reached. *See, e.g.*, A.R. 13031; A.R. 1356; A.R. 13071; A.R. 13082; A.R. 13111. Some provide that, in the event of default, the full amount owed to the MCA provider under the agreement comes due. *See, e.g.*, A.R. 13133; A.R. 13056; A.R. 13092; A.R. 13103.

Under some agreements, MCA providers withdraw their daily payment regardless of the merchant's actual daily receipts; in the event the provider's debit exceeds the specified percentage of a merchant's daily receipts, the merchant must request that the MCA provider remit the excess back to the merchant later. *Id.* Some agreements only allow for such reconciliation at the MCA provider's "sole discretion," A.R. 13082; A.R. 13092, and some only "[f]or as long as no [e]vent of [d]efault has occurred," A.R. 13144. And some agreements do not provide a reconciliation mechanism at all. *See* A.R. 13069-13081; A.R. 13174-13182.

The Bureau understands that merchants sometimes turn to MCAs due to the speed and ease with which they can be obtained. A.R. 71. A report by the Federal Trade Commission (FTC) in 2020, for example, noted that MCA providers tend to "cater to higher-risk businesses or owners with low credit scores—typically offering them higher-cost products." A.R. 72; *see also* A.R. 14 n.134 (citing Federal Reserve report indicating that annual percentage rates on MCA

products "can exceed 80 percent or rise to triple digits"); A.R. 73 (describing report by a community development lender of MCA contracts it had reviewed featuring APRs of up to 358 percent). Minority-owned businesses are significantly more likely to have applied for MCAs compared to white-owned firms. *Id.*

The rate of delinquency and default for MCAs is relatively high—between 6 and 20 percent, according to one estimate, and 10 percent according to a Securities and Exchange Commission analysis of one particular MCA provider. A.R. 72. The FTC and others have uncovered a number of problematic provider practices in this market, and the FTC has sued some MCA providers for misrepresenting the terms of agreements, unfair collection practices including threatening violence, and taking money from merchants' bank accounts without permission. A.R. 72.

MCA agreements can include numerous provisions to insulate providers from risk in the event of business downturn or failure. For example, the agreements routinely require personal guarantees of performance by the small business owners, under which business owners are personally liable for the full amount due in any breach or event of default. *See, e.g.*, A.R. 13036 ("owner(s) . . . guarantee the payment of and agree to pay Buyer and its assigns all amounts [the MCA provider] is entitled to receive."); A.R. 13064; A.R. 13083; A.R. 13097; A.R. 13105; A.R. 13123. Moreover, the MCA provider need not proceed against the business to recover before proceeding against its owners personally. *See, e.g.*, A.R. 13037; A.R. 13064. The agreements also commonly include pre-filled and signed confessions of judgment by the individual owners. *See, e.g.*, A.R. 13084; A.R. 13094; A.R. 13130; A.R. 13140. Further, the agreement may grant the MCA provider "a continuing priority security interest" in "all personal property of Seller that relates to the Future Receipts" including "equipment," "inventory," and "general intangibles,"

"whether now owned or hereafter acquired" by the merchant. *See, e.g.*, A.R. 13036; *see also* A.R. 13062.

Many agreements treat bankruptcy as an event of default, which triggers payment of the full amount to the MCA provider. *See, e.g.*, A.R. 13059 (it is an event of default if the merchant "admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or any proceeding is instituted by or against [the merchant] seeking to adjudicate it bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts[.]"); A.R. 13095; A.R. 13104; A.R. 13134; A.R. 13155. Some agreements that don't treat bankruptcy as an event of default nonetheless trigger personal guarantees and use of executed confessions of judgment to collect the full amount owed to the MCA provider. *See* A.R. 13164-65; A.R. 13155; A.R. 13084-85.

## C.  The Bureau's Small Business Lending Rule

The Bureau engaged in many years of outreach and study before even proposing a rule to implement Section 1071's requirements. *See* A.R. 22-23. In 2020, for example, the Bureau convened a Small Business Advisory Review Panel under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), as is required when the Bureau considers proposing a rule that could have a significant economic impact on a substantial number of small entities. A.R. 22.

As part of that process, the Bureau published a detailed outline of the proposals it was considering for the rule to implement Section 1071 and solicited feedback through public comments on its outline of proposals. *Id.* The Bureau's outline explained that it was considering carving out MCAs "since including them may add additional complexity or reporting burden given the unique structure of the transactions." A.R. 1580. The Bureau did *not* suggest that it was

considering carving out MCAs because they are not credit; rather, it noted that "a merchant receives a cash advance and promises to repay it . . . until the agreed upon payment amount is satisfied." *Id*. The Bureau specifically invited feedback on the question of whether to include or exclude MCAs. A.R. 1578.

The Bureau received significant feedback in response to its outline of proposals, including from small entity representatives, community groups, and industry representatives. Small Business Lending Data Collection Under the Equal Credit Opportunity Act, 86 Fed. Reg. 56,356, 56,405 (Oct. 8, 2021) (hereinafter cited to in the administrative record); A.R. 472. Stakeholders urged the Bureau not to exclude MCAs for several reasons, including that MCAs are often advertised as loans even though MCA providers have opposed labeling their products as loans; they are increasingly prevalent and higher-cost; and minority-owned small businesses disproportionately use them. *Id*. Stakeholders also noted that the complexity of MCAs is not a good reason to exclude them from coverage. *Id*. Throughout the rulemaking, MCAs were "a unique source of near-consensus among a diverse array of stakeholders—almost all of whom advocated for covering MCAs[.]" A.R. 472.

After considering this feedback and other materials, the Bureau issued a proposed rule and invited public comment. S*ee* A.R. 423. The proposed rule did not exempt MCAs. A.R. 472. The Bureau explained that it believed MCAs are distinct from factoring—transactions in which merchants sell a presently existing legal right to payment from third parties for goods supplied or services rendered, and the purchaser then seeks payment directly from the third party—and that MCAs met the definition of "credit" in ECOA, A.R. 473, while traditional factoring agreements do not, A.R. 476. The Bureau further stated its preliminary view that "inclusion of MCAs in the Bureau's 1071 rule is important to fulfilling both the fair lending and the business and

community development purposes of section 1071." A.R. 473. It again specifically sought comment on this approach. *Id.*

The Bureau received approximately 2,100 comments on the proposed rule, including a number that addressed coverage of MCAs.

After considering comments received, the Bureau issued the Final Rule, which was published in the Federal Register on May 31, 2023. A.R. 1. In the Final Rule, the Bureau confirmed that MCAs met the statutory definition of "credit" in ECOA because they involve "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment." A.R. 74 (quoting 15 U.S.C. § 1691a(d)). The Bureau did not exempt MCAs from the Rule's requirements, confirming its view that covering MCAs is important to fulfilling the express purposes of Section 1071. A.R. 74-75.

**D. This Litigation**

On December 26, 2023, Plaintiff Revenue Based Finance Coalition sued to challenge the Rule. ECF No. 1. The parties agreed that the case could be resolved on cross-motions for summary judgment and jointly proposed a briefing schedule, which the Court entered. ECF No. 15.

**STANDARD OF REVIEW**

Plaintiff claims that the Bureau exceeded its statutory authority when it covered MCAs under the Rule because, according to Plaintiff, MCAs are not "credit" under ECOA. In deciding whether to defer to the Bureau's interpretation of Section 1071, the Court must "ask whether Congress has directly spoken to the precise question at issue." *Lapham v. Walgreen Co.*, 88 F.4th 879, 893 (11th Cir. 2023) (citing *Chevron v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). If it has, the Court must give effect to Congress's intent and "that is the end of the matter[.]" *Id.*

8

If it has not, the Bureau's interpretation is entitled to deference if it "is rational and consistent with the statute." *Id*. (citing *Sullivan v. Everhart*, 494 U.S. 83, 89 (1990)).

Plaintiff next claims that even if MCAs are "credit," the Bureau acted arbitrarily and capriciously when it did not exclude MCAs from coverage. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "This standard is exceedingly deferential and limits [a reviewing court's] role to ensur[ing] that the agency came to a rational conclusion." *VHV Jewelers, LLC v. Wolf*, 17 F.4th 109, 114 (11th Cir. 2021) (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008)). "The reviewing court may not substitute its own judgment for that of the agency but must, instead, generally defer to the agency's technical expertise." *City of N. Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1266 (11th Cir. 2022).

## ARGUMENT

Plaintiff contends that the Bureau exceeded its statutory authority by including MCAs within the coverage of the Rule. But Plaintiff is wrong. Section 1071 applies to applications for "credit," and MCAs fit squarely within ECOA's definition of that term. Plaintiff also argues that even if MCAs are "credit" under ECOA, the Bureau's decision not to specifically exempt MCAs from the Rule was arbitrary and capricious. But this is wrong also. The Bureau reasonably determined that not exempting MCAs from Section 1071's requirements was important for advancing the two stated purposes of Section 1071: identifying credit needs and opportunities and facilitating enforcement of fair lending laws. Plaintiff fails to show that the Bureau's determination was unreasonable.

## I.   Merchant cash advances are "credit" subject to ECOA.

In ECOA, Congress defined "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services

9

and defer payments therefor." 15 U.S.C. § 1691a(d). The definition has two elements relevant here: (1) deferment of payment (2) on a debt.

MCAs involve both: MCA providers grant small businesses the right to incur debt and to defer its payment. They therefore fall under ECOA's definition of "credit."

Plaintiff's arguments to the contrary are unavailing. The statute does not exempt transactions merely because repayment on the debt may be subject to contingencies or because the creditor bears some risk of loss. Indeed, those are common features of many credit products. And while MCA providers may have attempted to style their products as "sales" of "future revenue," it is the substance of the agreements that matters under the statute, and the substance demonstrates that they defer payment on debts. MCAs are credit and subject to the data requirements of Section 1071 under the statute's plain terms.[2]

**a. Merchant cash advance providers grant merchants the right to defer payment.**

Plaintiff argues that MCAs are not credit because they do not involve the deferral of payment, but instead involve the "contemporaneous exchange of consideration." Mot. at 14. That is inaccurate.

In an MCA transaction, the MCA provider gives the merchant a lump sum of cash and grants the merchant the right to defer making payments until a later date. The promise to make future payments is the consideration that the merchant provides in exchange for up-front funds from the MCA provider. Plaintiff attempts to obscure the merchant's right (and obligation, incurred at the time the transaction is entered into) to repay at a later date by focusing on the fact

---

[2] As this brief explains, the best reading of the relevant statutory text is that MCAs are "credit" under ECOA. The Court thus can reject Plaintiff's erroneous reading of that provision without even needing to defer to the Bureau's interpretation. It would also be appropriate, however, to defer to the Bureau's interpretation of the term "credit" as including MCAs because that interpretation is clearly a "rational" and "permissible" one. *Lapham*, 88 F.4th at 893 (citing *Chevron, Inc.*, 467 U.S. at 837).

that the parties to an MCA enter into that agreement at a specific point in time, and at the moment they do so, there is a "contemporaneous exchange of consideration." *Id.* While true, Plaintiff's argument ignores that the only thing the merchant is contemporaneously providing at that time is a promise to repay in the future. Phrased in the relevant statutory terms, the MCA provider is granting "the right . . . to defer payment." Moreover, Plaintiff's argument—at least in its most basic form—would seem to apply to any credit transaction. Mortgages, car loans, and student loans, for example, all involve a "contemporaneous exchange of consideration" that occurs at the time of contracting. That is in fact a basic feature of legal contracts generally. *See, e.g.*, *Solnes v. Wallis & Wallis, P.A.*, 15 F. Supp. 3d 1258, 1268 (S.D. Fla. 2014) ("It is a fundamental principle of contract law that a promise must be supported by consideration to be enforceable."), *aff'd*, 606 F. App'x 557 (11th Cir. 2015). It does not distinguish MCAs or demonstrate that they do not fit under the statutory definition of "credit."

Nor can Plaintiff escape that definition by labeling MCAs as "sales" of future revenues. A merchant's proceeds from future sales of goods or services by definition do not exist in the present, and the merchant does not have a right to receive such proceeds that it can transfer to the MCA provider.[3] A.R. 74. (As discussed below, this feature of MCAs distinguishes them from factoring, in which a merchant sells accounts receivable—*i.e.*, the yet-to-be-delivered proceeds from prior completed sales.) As the merchant has no asset to transfer to the MCA provider at the

---

[3] Plaintiff disagrees and claims that merchants *do* have a right to proceeds from future hypothetical sales that they can transfer to MCA providers. *See* Mot. at 14 n.7. But the only cases Plaintiff musters for that counterintuitive proposition are no help to it. One merely held that "an employee *who is fully vested under a pension plan* has a right to receive payment." *In re Marriage of Grubb*, 745 P.2d 661, 665 (Colo. 1987) (emphasis added). The other said that those who "hold a 'right'" to receive payment from a business have "some sort of intangible property right under Wisconsin law." *In re Kedrowski*, 284 B.R. 439, 447 (Bankr. W.D. Wis. 2002). A merchant's mere expectation of revenue from future sales is nothing like payments from a fully vested pension plan; nor, again, does the merchant "hold a 'right'" to revenues from future sales.

moment the MCA is taken out, the only way the agreement can function is as a promise by the merchant to make payments to the MCA provider in the future until a particular amount is satisfied. And so, the MCA provider gives the merchant cash at one time and grants the merchant a right to defer payment until a later time.

The contrast between MCAs and factoring helps to illustrate Plaintiff's error. Factoring is the sale of accounts receivable—that is, specific payments that are already owed to the merchant by specific third parties for goods or services already rendered. A.R. 74; A.R. 87. A merchant has made a sale of goods or services to a known buyer who is obligated to pay for them; the merchant then sells that obligation to the factoring provider (known as the factor). *Id.* Having purchased this payment obligation, the factor is then entitled to receive payment directly from those buyers, and the merchant no longer has any role in collecting payment from the purchasers. *See, e.g.*, *eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*, 519 F. Supp. 3d 1129, 1132 n.2 (S.D. Fla. 2021) ("[T]he factor does not collect amounts directly from its own customer, but from its customers' customers."). Thus, in factoring, the merchant does not receive a right to defer payment to a later date: the right to payment on an invoice is a specific asset owned by the merchant, and the merchant exchanges it for cash at the time it enters the factoring agreement. In assigning the right to payment on the invoice to the factor, the merchant has exchanged cash for an existing asset, and retains no ongoing payment obligation to the factor.

As noted, that is meaningfully different from how MCAs operate. A merchant taking out an MCA does not transfer or assign any specific asset at the time of the MCA transaction, and an MCA provider gains no present interest in anything at the time of the MCA transaction, as the merchant has not made sales whose accounts receivable it can transfer or assign to the MCA provider. The merchant merely makes a promise to pay the MCA provider later, purportedly as

12

the result of hypothetical *future* sales of goods or services, until a particular amount is satisfied. In other words, the MCA provider grants the merchant the right to defer payment.

In contrast to factoring, the MCA provider does not take on the role of servicing or collecting payments from the merchant's customers; the merchant collects payments from its customers, and remits to the MCA provider a portion of what the merchant is able to collect over a series of payments. This makes sense, as the payment obligation remains with the merchant, who must continue making incremental payments over time until a specified amount is reached.

Plaintiff argues that Congress must have intended for Section 1071 to exclude MCAs because Congress "legislated against the backdrop" of prior Regulation B commentary stating that *factoring* is not subject to Regulation B. Mot. at 17-18. But that commentary said nothing to exempt *MCAs*, which, as explained, differ in critical ways from factoring. Thus, agency commentary on factoring has no bearing on whether or not MCAs are "credit" under ECOA.[4]

Plaintiff next argues that MCAs involve no right to defer payment because, Plaintiff claims, there is no obligation to repay *at all* until the moment that a merchant generates revenue. Mot. at 14. As noted above, *see supra* at 3-6, that description is inconsistent with how many MCAs actually operate.

But even on its own terms, Plaintiff's claim falls short. It ignores the "contemporaneous exchange of consideration" that Plaintiff so emphasizes elsewhere and that forms the heart of the MCA agreement: a lump sum up-front from the MCA provider in exchange for a promise by the merchant to repay later. Plaintiff's argument is also contrary to the text of the statutory definition, which does not turn on when an obligation to repay kicks in but on whether the

---

[4] Indeed, the commentary to the Bureau's Rule reiterates that factoring—unlike MCAs—is not a "covered credit transaction" under the Rule because it is not credit under ECOA. A.R. 88.

creditor has granted "the right . . . to a debtor to defer payment of debt or to incur debts and defer its payment." 15 U.S.C. § 1691a(d). Plaintiff can hardly dispute that MCA agreements grant merchants "the right . . . to defer payment"—that is the basic nature of the exchange. An MCA that required immediate repayment of the money advanced would be self-defeating.[5]

Plaintiff attempts to analogize to indemnity agreements, Mot. at 14, but that analogy crumbles at the touch. Whether or not an indemnity agreement involves one or more payments made after the time of contracting, indemnity agreements do not typically involve a creditor granting a debtor the right to defer payment on "a debt" at the time of contracting. And without those features, the agreement will not constitute "credit" under ECOA, as Plaintiff's own cited cases (Mot. at 14) show. *See Ulico Cas. Co. v. Superior Mgmt. Servs., Inc.*, 89 F. App'x 278, 279 (D.C. Cir. 2004) ("Without a right to defer payment *of debt*, there has been no extension of 'credit' under the ECOA" (emphasis added)); *SureTec Ins. Co. v. Nat'l Concrete Structures, Inc.*, No. 12-cv-60051, 2012 WL 12860161, at *3 (S.D. Fla. July 3, 2012) (holding that an indemnity agreement was not a credit transaction under ECOA "because no Defendant obtained any right to defer the payment *of a debt*" (emphasis added)).

**b. Merchant cash advances involve "debts" owed by the merchant to the provider.**

Plaintiff also claims that MCAs are not "credit" under ECOA because they do not involve "debt." Again, Plaintiff errs.

---

[5] Plaintiff's argument that "the relevant inquiry under ECOA is whether a debtor has a right to defer payment at the time the obligation to pay attaches," Mot. at 14, leads to other absurdities. Under that reasoning, a mortgage loan requiring payment on the first of every month would seem not to qualify as "credit," because the obligation to repay does not "attach" until each due date, at which point the borrower has no further right to defer payment.

14

          *i.  Merchant cash advances involve the creation of "debt" as that term is employed in ordinary usage, dictionaries, and other statutes.*

Neither ECOA nor its implementing rule, Regulation B, define "debt." This silence suggests that Congress intended the term to bear its ordinary meaning of "something owed." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/debt (last visited Apr.12, 2024); *see also* Debt, *Oxford English Dictionary* (2d ed. 1989) ("That which is owed or due; anything (as money, goods, or service) which one person is under obligation to pay or render to another"); Debt, *Black's Law Dictionary* (11th ed. 2019) ("liability on a claim; a specific sum of money due by agreement or otherwise").

These definitions comport with the broad definition of "debt" in the Fair Debt Collection Practices Act: "any obligation or alleged obligation of a consumer to pay money" arising from a transaction. 15 U.S.C. § 1692a(5). The Bankruptcy Code's definition of "debt" is in accord; "debt" means simply "liability on a claim." 11 U.S.C. § 101(12). And "claim" means either a "right to payment" or the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment[.]" *Id.* § 101(5)(A), (B). The term includes rights to payment regardless of whether they are "fixed [or] contingent," "liquidated [or] unliquidated," or "secured, or unsecured[.]" *Id.*

All of these definitions point to the same (obvious) conclusion: Merchants entering into an MCA incur a "debt" because the MCA agreement creates an obligation for them to repay the MCA provider for the amount of the up-front payment plus some additional amount. Indeed, without that basic obligation to repay, providers would have no business reason for offering MCAs in the first place.

15

      *ii.  Whether an obligation to pay is a "debt" does not turn on whether the obligation is contingent or whether the lender has recourse against the borrower.*

Plaintiff argues that MCAs do not create debts because MCA providers purportedly may not receive payment "where future receipts do not materialize in the ordinary course of business" or "when a business goes under." Mot. at 13. As an initial matter, this is not accurate. *See supra* at 3-6. But even if it were true, Plaintiff fails to show why that would establish that MCAs do not involve "debts." And, in fact, many forms of debt involve contingency of repayment or variability of payments depending on certain circumstances.

Reverse mortgages, for example, make repayment contingent on a termination event, such as the death of a borrower, and the amount of the payment obligation will vary based on the valuation of the home at the time of the termination event. *See* 12 C.F.R. § 1026.33(a). Yet, reverse mortgages are credit subject to the Truth in Lending Act, which similarly defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f); 12 C.F.R. § 1026.33(a). Even ordinary mortgage loans can feature variable payments because they provide for loss mitigation where borrowers struggle to afford their payments, lowering payments to an affordable level if the borrower can substantiate their financial hardship. *See* 12 C.F.R. § 1024.41; *see also, e.g.*, Fannie Mae, *Fannie Mae Flex Modification*, https://www.fanniemae.com/here-help-single-family/fannie-mae-flex-modification (last visited Apr. 12, 2024). Federal student loans, a portfolio of debt that exceeds $1 trillion dollars, also exhibit both variable payments and contingency: they provide for fluctuation of monthly payments based on a borrower's income level and also allow borrowers to discharge unpaid balances under certain conditions. *See* 34 C.F.R. §§ 685.213, 685.219, 685.214, 685.221, 685.209. Yet, there is no serious dispute that mortgages and student loans involve debt.

In a similar vein, Plaintiff argues that the Bureau "unreasonably chose to define credit without consider[ing] factors such as the absence of recourse or analysis of who bears the risk of loss." Mot. at 19 (quotation marks omitted). This argument fails for several reasons. First, and most fundamentally, it was Congress who defined "credit" under ECOA—not the Bureau. And Plaintiff's additional requirements find no basis in the text of the statute Congress enacted, which does not turn on the factors Plaintiff suggests. *See* 15 U.S.C. § 1691a(d).

Second, Plaintiff fails to recognize that non-recourse debts are still debts. The fact that a loan is non-recourse "does not alter the nature of the obligation" even if the lack of personal liability means the lender's "remedy is limited[.]" *C.I.R. v. Tufts*, 461 U.S. 300, 311-12 (1983); *accord Western Group Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1356 n.2 (11th Cir. 1999) ("Nonrecourse debt is 'debt secured by the property that it is used to purchase. The purchaser of the property is not personally liable for the debt on default. Rather, the creditor's recourse is to repossess the related property.'") (citing Black's Law Dictionary); *see also In re Saylors*, 869 F.2d 1434, 1436 (11th Cir. 1989) (discussing treatment of nonrecourse debt in bankruptcy proceeding). And finally, in many cases MCAs do in fact impose personal liability on small business owners, *see supra* at 5-6, and require payment even when the business fails, *see supra* at 6.

As with contingent or variable-payment debts, non-recourse debts are not rare either. For example, reverse mortgages are "generally non-recourse[.]" *Bennett v. Donovan*, 703 F.3d 582, 585 (D.C. Cir. 2013). Purchase-money mortgages in states like California are also. *See Coker v. JPMorgan Chase Bank, N.A.*, 364 P.3d 176, 192 (Cal. 2016). Even some auto loans are non-recourse. *Cox v. Cmty. Loans of Am., Inc.*, 2014 WL 1216511, at *17 (M.D. Ga. Mar. 24, 2014) (finding that "non-recourse" vehicle title loans "are 'consumer credit' transactions within the

meaning of the M[ilitary] L[ending] A[ct]" even if they are not considered "credit" transactions under state law), *aff'd*, 625 F. App'x 453 (11th Cir. 2015). The lack of recourse hardly renders these obligations something other than debts, much less exempts the lenders from laws governing credit transactions.[6]

### c. Section 1071's data requirements apply to all forms of "credit" under ECOA, including merchant cash advances.

Plaintiff goes even further astray in arguing that Section 1071's requirements apply only to "loans" and that MCAs do not qualify as "loans." *See* Mot. at 15-16.

In fact, Section 1071 applies "in the case of any application to a financial institution *for credit* for [a] women-owned, minority-owned, or small business." 15 U.S.C. § 1691c-2(b)(1) (emphasis added). Section 1071 amends the Equal Credit Opportunity Act. As the Act's name suggests, it generally applies to "credit." *See, e.g.*, *id.* § 1691(a) (prohibiting discrimination in "any aspect of a credit transaction"). Numerous specific provisions of Section 1071 make clear that coverage under that provision—like under the rest of ECOA—turns on the term "credit." *See id.* § 1691c-2(b)(1) (referring to "*any* application . . . for credit"), (c) ("*[a]ny* applicant for credit"), (d) ("an application for credit"), (e)(2)(B) ("the loan or other credit being applied for"),

---

[6] Plaintiff's reliance on *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714 (S.D. Ohio 1998), Mot. at 13, is misplaced. The court there held that an equipment leasing agreement was not a credit transaction under ECOA because the lessees only paid so long as they maintained possession of the equipment—thus demonstrating that there was no deferral of payment on the debt, but only ongoing payments for the continued right to use the equipment. *Id.* at 717. (The Bureau's Rule excludes business leases from the category of "covered credit transactions" on the same logic. A.R. 91.) In so holding, the court noted that the lessees' obligation to pay would be extinguished once they returned possession of the equipment. But the court did *not* conclude that this fact meant the lessee's obligation to pay was not a "debt," *contra* Mot. at 13; instead, the court cited this fact to support its conclusion that "the lessees' financial obligation was *contemporaneous* with possession of the equipment" and thus the lessees did not incur a debt "for which payment was deferred," 6 F. Supp. 2d at 717 (emphasis in original).

(e)(2)(C) ("the amount of the credit or credit limit applied for, and the amount of the credit transaction or the credit limit approved").

Plaintiff's reading would render the statutory text incoherent. Nor can Plaintiff explain *why* Congress would have chosen to limit the application of Section 1071 (but no other part of ECOA) to "loans," a term not defined in the statute, rather than instead having coverage of Section 1071 turn, like the rest of ECOA, on the defined term "credit." Congress stated that Section 1071 was intended to "facilitate enforcement of fair lending laws" (which, despite the word "lending," are not limited in their application only to "loans") and enable "creditors" and others to identify "business and community development needs and opportunities." *Id.* § 1691c-2(a). The arbitrary and poorly-defined limitation on Section 1071 that Plaintiff proposes thus is not only inconsistent with the text of the statute but with Congress's expressly stated intentions, which are not confined to collecting data only about "loans" to small businesses.

Although the Court can and should reject Plaintiff's strained reading on those grounds alone, it is notable that MCAs likely would not even fit through Plaintiff's imagined loophole. While Plaintiff cites to some cases concluding that MCAs are not loans, Mot. at 16 n.10, most of these cases concern claims that particular MCAs violated New York usury law, and "claims of usury must be proven by clear and convincing evidence, a much higher standard than the usual preponderance." *In re GMI Grp., Inc.*, 606 B.R. 467, 484 (Bankr. N.D. Ga. 2019). Importantly, these cases do not address whether MCAs are "credit" under ECOA—the relevant inquiry here.

And more recent cases applying the same state law have come out the other way, noting that factors heavily relied upon in prior decisions "are far from dispositive." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247 (S.D.N.Y. 2022). These more recent decisions have concluded that MCAs "operate in a manner more akin to a standard, high-

19

interest rate loan," singling out terms providing that a merchant defaults if it does not maintain a sufficient balance to cover a daily debit, terms enabling the MCA provider to recover the full balance due upon default, the personal guaranty, and use of confessions of judgment. *Id.* at 249-50. Together, "[t]hese provisions suggest that the plaintiff did not assume the risk that [merchants] would have less-than-expected or no revenues." *Id.; see also Lateral Recovery LLC v. Queen Funding, LLC*, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022) (concluding that "the economic substance of the [MCA] transaction was a loan, not a purchase of receivables"); *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *10 (S.D.N.Y. June 6, 2022) ("Reading the [MCA] agreement in its totality and by its real character, it constitutes a loan and not a sale of assets."); *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664 (N.Y. App. Div. 2020) (highlighting reconciliation provision, terms of default, personal guarantee, and confession of judgment in concluding that MCA operated as a loan).

## II.    The Bureau's decision not to exempt merchant cash advances from the Rule's coverage was reasonable and consistent with the statute.

Plaintiff claims that even if MCAs are credit, it was unreasonable for the Bureau not to exclude MCAs from the Rule. But Section 1071 applies to all applications for "credit" under ECOA, unless the Bureau creates an exception "by rule or order," "as the Bureau deems necessary or appropriate to carry out the purposes of this section." 15 U.S.C. § 1691c-2(g)(2).[7] And Plaintiff hasn't shown that the Bureau acted arbitrarily or capriciously by declining to carve MCAs out of the Rule. Contrary to Plaintiff's claims, the Bureau neither based that decision on an improper rationale, nor failed to respond adequately to comments during the rulemaking.

---

[7] Section 1029 of the Consumer Financial Protection Act also exempts auto dealers from Bureau authority, 12 U.S.C. § 5519, and the Rule's commentary reiterates that they are excluded from coverage, A.R. 393.

a. **The Bureau reasonably concluded that not excluding merchant cash advances furthers Section 1071's fair lending and business and community development purposes.**

Plaintiff's central claim why the Bureau acted arbitrarily and capriciously in declining to exempt MCAs from the Rule is that, purportedly, the Bureau's "justification" for doing so was "to 'create a more level playing field' for banks and other sales-based financing competitors." Mot. at 19-20. That key premise of Plaintiff's argument is simply not accurate.

The Bureau explained in the Rule that it "believes that the inclusion of merchant cash advances in the Bureau's [final] rule is important to fulfilling both the fair lending and the business and community development purposes of Section 1071." A.R. 74-75. The Bureau concluded that including MCAs would help to "create a dataset that better reflects demand for such financing by the smallest and most vulnerable businesses[,]" and thus shed light on those transactions. A.R. 75. In addition, the Bureau noted commenters' concerns about high costs and predatory practices among MCA providers, as well as MCAs' "increasingly prevalent use among minority business owners." *Id*.

The record before the Bureau demonstrated the need for enhanced data on and transparency into the MCA market. Materials from other regulatory and law enforcement agencies explained how ECOA-mandated data reporting by MCA providers would fulfill Section 1071's purpose of enabling "communities, governmental entities, and creditors to identify business and community development needs" for small businesses. For example, in a joint comment, focused entirely on MCAs, the New York and New Jersey Attorneys General wrote:

> The inclusion of MCA transactions within the scope of the Proposed Rule is crucial given both the rapid expansion of the MCA market in the past decade and limited publicly available data on market size or standard industry practices. . . . [I]nformation on practices within the industry, such as typical financing terms and costs of capital, is limited.

A.R. 18826. The comment noted that data reporting by MCA providers under Section 1071 "will promote fairness, transparency and enhanced data collection in the area of small business financing[.]" A.R. 18827. In addition, a report from the FTC notes that a lack of clear information on MCAs' key features "imped[es] small business owners' ability to make apples-to-apples comparisons" when shopping for credit. A.R. 8349.

The record before the Bureau also demonstrated that data reporting by MCA providers may help address fair lending concerns, as MCAs have generated repeated claims of unlawful or problematic provider practices, and data suggest that MCAs are disproportionately incurred by businesses owned by people of color. A.R. 72. In a comment, the FTC explained that because of a lack of transparency, "detecting illegal conduct in [the small business] space can be challenging." A.R. 22313-14. The FTC specified that "[t]his is a particular concern with Merchant Cash Advances ('MCAs')." *Id.* As noted above, *see supra* at 5, the FTC has also identified a litany of concerns about MCAs, including high costs and abusive collection tactics, and has brought a number of enforcement actions against MCA providers in recent years. A.R. 8224, A.R. 8227, A.R. 8230, A.R. 8233, A.R. 8351-53. In their comment, the Attorneys General of New Jersey and New York listed a number of "problematic provider practices" giving rise to enforcement actions, including deceptive sales tactics, finance charges in excess of state usury limits, and unlawful collections. A.R. 18826. They also flagged MCA providers' practice of obtaining and filing pre-executed confessions of judgment. *Id.*

A significant number of community groups, small business advocacy groups, and nonprofit organizations specifically urged the inclusion of MCAs given the lack of transparency into the market and concerns about MCAs' costs and MCA providers' practices. As one wrote:

> [R]equiring lenders . . . to disclose data on their lending activity is a highly effective way to ensure compliance with fair lending laws. Having access to the data of merchant cash

advance companies, for example, which engage in high-cost lending, would allow for monitoring their financing for abuses.

Brooklyn Legal Services Comment (A.R. 19285). Similar comments from community groups or other nonprofits were myriad. *See, e.g.*, Comments from South Carolina Association for Community Economic Development (AR 18396) ("SCACED has a strong desire to see merchant cash advance (MCA) companies subject to data sharing requirements. . . . This form of lending has been high cost and can be abusive, particularly among business owners of color and immigrants."); California Association for Micro Enterprise Opportunity (A.R. 18598) (citing research identifying MCAs as "potentially higher-cost and less-transparent credit products.")

In short, the Bureau did not decline to exclude MCAs because it wanted to give MCA providers' competitors a leg up (as Plaintiff claims) but because it reasonably determined, based on the record before it, that data reporting by MCA providers would generate valuable information that would help to fulfill both the business and community development and fair lending purposes of Section 1071.

> **b. The Bureau did not rely on any impermissible factor when it recognized that a rule covering more forms of credit would shed greater light on the small business lending market.**

As described above, the Bureau explained its conclusion that declining to exempt MCAs from ECOA's requirements fulfills the dual statutory purposes animating Section 1071: facilitating fair lending enforcement and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities. A.R. 74-75. Given the ample evidence in the administrative record indicating that the MCA market currently lacks transparency and that MCA providers' practices raise fair lending concerns, the Bureau's conclusion was plainly reasonable.

Plaintiff mischaracterizes the Bureau's reference to a "level playing field," then bases most of its arbitrary and capricious arguments on that obvious mischaracterization. The phrase appears in a single sentence, which, tellingly, Plaintiff's motion never once reproduces in full (while quoting the phrase "level playing field" 27 times). In that sentence, the Bureau explained:

> The Bureau also believes that including merchant cash advances will create a more level playing field across financial institutions that provide cash flow financing to small businesses by shedding light on such credit transactions as well as create a dataset that better reflects demand for such financing by the smallest and most vulnerable businesses.

A.R. 75. Plaintiff portrays that statement as describing a desire by the Bureau to "impos[e] regulatory burdens on sales-based financing providers in order to benefit their competitors." Mot. at 20-21 (internal quotation marks omitted). But that is not a fair or accurate reading. Read in context, the Bureau's statement reflects its reasoned judgment that covering MCAs under the Rule, alongside other forms of credit, will provide improved information about small business credit generally and allow small businesses to make better choices among available options. *See* A.R. 19. And communities, government entities, and creditors themselves—including MCA providers—will have better information on the demand for financing from small businesses. *Id*.

Even on its own terms, Plaintiff's position makes little sense because it was Congress—not the Bureau—that required a "level playing field" for different types of creditors by directing that Section 1071's requirements should broadly apply to applications for "credit." 15 U.S.C. § 1691c-2(b). As discussed above, Section 1071 grants the Bureau the power to adopt exceptions from its requirements only when "the Bureau deems [it] necessary or appropriate to carry out the purposes of this section." 15 U.S.C. § 1691c-2(g)(2). But after considering the relevant comments and information in the record, the Bureau concluded that not excluding MCAs "is important to fulfilling both the fair lending and the business and community development

24

purposes of section 1071[,]" A.R. 74-75, and no commenter (including Plaintiff) argued that either statutory purpose would be carried out by excluding MCAs. And so, the Bureau properly left MCAs within ECOA's ambit as Congress provided. The Bureau thus was not "leveling the playing field" so much as leaving in place the default set by Congress.

### c.  The Bureau reasonably considered all relevant comments.

Plaintiff falls back on a laundry list of claims that the Rule is arbitrary and capricious because the Bureau failed to respond adequately to various specific aspects of its comment letter and others. Plaintiff is wrong.

The Bureau noted in issuing the Rule that, "throughout the development of the rule . . ., merchant cash advances [were] the focus of significant attention and a unique source of near-consensus among a diverse array of stakeholders—almost all of whom advocated for covering merchant cash advances." A.R. 72-73.[8] The Bureau reasonably considered all of the significant comments it received about MCAs, including those from the only commenters that supported excluding MCAs from Section 1071's requirements: MCA providers and trade associations representing them. *See id.*

As described above, many commenters expressed strong concerns about high costs and predatory practices associated with MCAs. *Id*. at 73. For example, commenters pointed to high annual percentage rates for MCAs, citing one product with a rate of 358 percent. *Id*. Commenters also raised concerns about aggressive and potentially misleading marketing practices; high

---

[8] Plaintiff implies that support for covering MCAs came primarily from their industry competitors. *See* Mot. at 20 (describing the Bureau "pivot[ing]" to covering MCAs in response to comments from "[c]ompetitors"). But the Rule itself notes that the Bureau "received comments on this aspect of the proposal from a wide range of lenders, trade associations, business advocacy groups, community groups, individuals, the offices of two State attorneys general, and others," A.R. at 73, and that almost all of them advocated for covering MCAs. *Id*.

delinquency/default rates among small businesses that use MCAs; aggressive and abusive collection tactics (including freezing owners' bank accounts, and pressing family members, neighbors, customers and others to compel payment); and the "increasingly common practice [within MCA lending] of using confessions of judgments (where a borrower must agree to allow the lender to obtain a legal judgment without going to court)." *Id*. at 72-73, 8351-53.

The Bureau considered these comments, and noted that the reports of predatory practices, combined with increasingly prevalent MCA use among minority business owners, gave credence to claims that MCAs may raise fair lending concerns. It concluded that covering MCAs was "important to fulfilling" the fair lending purposes of Section 1071, as well as the business and community development purpose. A.R. 75. For example, including MCAs will help create a dataset that better reflects the market and its demand for such financing by the smallest and most vulnerable businesses. *Id*. Plaintiff does not point to any significant comments that the Bureau failed to reasonably consider in making these determinations.

### i. The Bureau reasonably considered policy implications of the Rule.

Plaintiff attempts to show that the Bureau insufficiently addressed Plaintiff's concerns about the policy implications of covering MCAs. Specifically, Plaintiff alleges that the Bureau did not adequately consider that MCAs are "faster . . . and simpler to obtain" than other financing (as well as subject to generally higher approval rates, and offered in smaller amounts) and that subjecting MCAs to the Rule's requirements might dilute these "benefits" and make MCAs more expensive, by passing compliance costs on to merchants. Mot. at 25. But the Rule explicitly acknowledges the properties of MCAs that Plaintiff highlights, *see* A.R. 71 ("merchant cash advances are often used . . . due to the speed and ease with which they can be obtained"),

26

and even Plaintiff notes that the Rule *does* acknowledge comments asserting that these features might be impacted by the Rule covering MCAs, Mot. at 26.

Plaintiff's argument also overlooks the Rule's extensive discussion of costs that may be passed through to small businesses, and in particular about the costs likely to be incurred by non-depositories, such as MCA providers. *See, e.g.,* A.R. 359, 365-66.[9] It also ignores the Bureau's explanation for why—even if the Rule were to have an effect on the availability of MCAs—MCAs should not be excluded from the Rule's coverage. The Rule explains that some of the "benefits" Plaintiff highlights (*e.g.*, accessibility via faster processing time and higher approval rates) cause MCAs to be used particularly by merchants unable to obtain other financing, and in ways that could "potentially jeopardize [small businesses'] financial health[.]" A.R. 72.

As described above, the reports the Bureau received about problematic MCA provider practices contributed to the Bureau's determination not to exclude MCAs. A.R. 75. It made this determination, even while acknowledging that MCAs provide higher approval rates and faster processing times than other types of credit, *id.* at 71, and that coverage by the Rule might impact MCA availability. The Bureau "reasonably explained" why the Rule does not exclude MCAs, and Plaintiff fails to point to any "relevant issue" that the Bureau failed to reasonably consider. *See Prometheus Radio Project*, 592 U.S. at 423. "The APA requires no more." *Id*. at 427.

---

[9] To the extent that this discussion does not specifically address MCAs, that may be because MCAs failed to submit responses to a survey of financial institutions that the Bureau conducted prior to issuing a proposed rule, in order to gather information relevant to assessing the likely one-time, up-front costs of compliance. *See infra* at 28-30. While Plaintiff claims there was "no reason for sales-based financing providers to submit cost data" to the Bureau because "the Bureau was not even planning to cover sales-based financing" when the Bureau issued the survey, Mot. at 26, Plaintiff ignores the fact that the Bureau had made no such pronouncements about the coverage of the rule. While the survey was open, the Bureau indicated that it *was considering* proposing to exclude MCAs from coverage, and specifically sought comment about this topic and related costs. *See infra* at 30.

*ii. The Bureau reasonably considered comments about its cost analysis.*

Plaintiff's claim that the Bureau "failed to address deficiencies in its cost analysis" fares no better. *See* Mot. at 26. In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons." 12 U.S.C. § 5512(b)(2)(A)(i). The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. A.R. 343.

The record makes clear that the Bureau thoroughly analyzed the expected benefits, costs, and impacts of the Rule, and provided an extensive account of the Bureau's methodology for estimating specific categories of both one-time and ongoing costs. A.R. 342-377. The Bureau engaged in extensive outreach and study even before proposing a rule, including convening a SBREFA panel specifically intended to understand the potential impact of the Rule on small entities, and conducting a survey of financial institutions to gauge the expected up-front costs of collecting the statutorily enumerated data points and financial institutions' responses to the compliance costs of implementing Section 1071. A.R. 22-23. The Bureau then estimated the specific number of financial institutions likely to be required to report under the Rule, *id.* at 346, and developed a cost methodology estimating both one-time and ongoing costs likely to be incurred by those institutions, *id.* at 347-354. The Bureau appropriately accounted for variation in costs by assuming different cost structures based on differences in financial institutions' level of complexity in compliance operations. *Id.* at 348. Finally, the Bureau accounted for variation in one-time costs based on whether or not the institution was a depository institution. *Id.*

The Bureau's cost estimates in the Final Rule were informed by comments it solicited, received, and considered after specifically seeking feedback on its methodology for estimating

one-time and ongoing costs, and on the estimates of the specific costs themselves. *Id.* at 345. The Bureau also detailed at great length its assessment of the Rule's likely effects. *Id*.

Despite this, Plaintiff alleges that the Bureau did not adequately consider its arguments that the cost analysis is "deficient." Mot. at 26. Plaintiff claims the Bureau insufficiently considered its comments about (1) the data about initial, up-front ("one-time") costs that financing providers would bear to comply with the Rule; (2) costs associated with "subjecting sales-based financing providers to [a] broader set of ECOA regulations"; and (3) the differences between HMDA's and Section 1071's compliance costs, and why the Bureau viewed their comparison as suitable for the purposes of analyzing costs.[10] Plaintiff is incorrect.

First, while Plaintiff wishes the Bureau had additional data from MCA providers to factor into its cost analyses, the Bureau's reliance on the data it had is more than sufficient. The Bureau solicited cost data from regulated entities, including non-depositories like MCA providers, and considered the data it received. And while it acknowledged the relative lack of data for non-depositories, the Bureau explained that through outreach efforts with non-depository institutions and trade associations, the SBREFA process, and the one-time cost survey, the Bureau *had* obtained information about the costs for non-depositories of complying with the Rule. A.R. 351. This is sufficient, as the Supreme Court has held that the APA imposes no obligation for agencies to obtain or generate specific types of data or "to conduct or commission their own empirical or statistical studies." *See Prometheus Radio Project*, 592 U.S. at 415.

---

[10] Plaintiff also challenges the Bureau's reliance on results of its survey because the survey "assumed that reporting was required for only the thirteen statutorily required data points." Mot. at 26-27. Plaintiff ignores, though, the Bureau's specific treatment of this issue, and its analysis estimating additional costs for collecting the data points beyond those specifically enumerated in the statute. *See* A.R. at 367. And Plaintiff offers no reason that the Bureau's treatment of this issue is unreasonable or explanation of why it would bear on the specific question of whether MCAs should have been excluded from the Rule's coverage.

Moreover, Plaintiff attributes the dearth of specific data about MCAs to providers having had "no reason" to submit cost data in response to the survey because "at the time the Bureau issued the survey in July 2020, the Bureau was not even planning to cover sales-based financing under the Rule." Mot. at 26. Plaintiff is apparently referring to the outline of proposals that the Bureau released nearly two months later, on September 15, 2020, as part of the SBREFA process, which indicated that "[t]he Bureau is considering proposing that [MCAs] not be covered by the 1071 rule." A.R. 1578. But as that language demonstrates, the outline itself made clear that the Bureau had not yet arrived at a decision whether or not to exclude MCAs. And in the outline, the Bureau specifically sought feedback and information about that approach, including asking financial institutions "[w]hat challenges would you anticipate if . . . MCAs or some subset(s) thereof, were included as covered products under the 1071 rule?" A.R. 1578.

Thus, at the time the cost survey was open,[11] MCA providers had notice that the Bureau was considering whether to propose a rule implementing Section 1071 that would cover MCAs and an opportunity to participate or otherwise provide input. If that were not enough, they had another opportunity during the notice-and-comment period, when the Bureau's proposed rule made clear that the Bureau was contemplating covering MCAs under the Rule. MCA providers thus had sufficient opportunity and incentive to provide whatever information and other feedback they believed relevant to the rulemaking, including in response to the one-time cost survey, in commenting on the SBREFA outline of proposals, and in commenting on the proposed rule. If they chose not to do so, the Bureau cannot be faulted for reasonably "rel[ying] on the data it had[.]" *Prometheus Radio Project*, 592 U.S. at 424 (rejecting claim that agency acted arbitrarily

---

[11] Responses to the Bureau's survey were due on October 16, 2020. A.R. 23.

where the agency acknowledged gaps in the data and relied on the data it had because, despite asking for data on the issue, the agency received no other data).

With respect to Plaintiff's argument that the Bureau should have considered costs of "sales-based financing providers" having to comply with "ECOA's requirements more broadly" as a result of the Rule, it is important to note that the Rule does not make anyone subject to other provisions of ECOA when they were not before. The Rule declines to exempt MCAs from the Rule because they are "credit" and because "inclusion of [MCAs] in the Bureau's rule is important to fulfilling both the fair lending and the business and community development purposes of section 1071." A.R. 74-75. To the extent that during the SBREFA process the Bureau considered not covering MCAs, that was *not* because the Bureau did not consider these to be "credit" but because at the time the Bureau thought that "including them may add additional complexity or reporting burden given the unique structure of the transactions." AR1580. Plaintiff thus fails to identify additional costs of ECOA compliance that the Bureau should have considered here.

Plaintiff's final argument claiming that the Bureau "inadequate[ly]" considered comments about costs is similarly unavailing. In its comment letter, Plaintiff argued that the Bureau had not "adequately explained why it was reliable to analogize [costs of the proposed rule's data collection] to costs associated with HMDA compliance," given "major differences between the two statutes' requirements." Mot. at 26, 27. Plaintiff's motion alleges that the Bureau "entirely failed to respond" to this comment, *id,* and that "the CFPB could have"—but didn't—"grapple[] with the differences between the HMDA's and Section 1071's compliance costs and clarified why it nonetheless viewed their comparison as suitable for the purposes of analyzing costs." *Id*. at 36.

Plaintiff's argument is confusing—because in the Rule the Bureau did exactly what Plaintiff suggests it should have. The Rule explains why the Bureau expects that the tasks required for ongoing reporting under the Rule "will be similar to those under the 2015 HMDA final rule"—because HMDA, which is another data collection and reporting statute the Bureau administers, has long required financial institutions to collect, report, and disclose data about mortgage loans and loan applications, and the referenced 2015 HMDA final rule, which implements that statute, is "another regulation that requires collecting and reporting credit application data." A.R. 25, 347. The 1071 Rule clearly acknowledges, though, that "the markets to which HMDA and section 1071 apply are . . . different in significant respects, and those differences are reflected between the [the rules implementing 1071 and HMDA]." A.R. 25.

In other words, the Bureau did not rely uncritically on HMDA cost estimates. Rather, "the Bureau *adapted* its methodology from its 2015 HMDA rulemaking activities to the small business lending market." A.R. 347 (emphasis added). And it reasonably explained how it made those adaptations: "The Bureau used the SBREFA process, NPRM comments, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences [between the home mortgage and small business lending] markets would change the tasks required for data collection, checking for accuracy and reporting under the final rule [from those required in the HMDA context]." *Id*. For example, the adaptations included changing the number of loan officers for representative institutions, the number of data points per application, and the estimated number of applications themselves. *See* A.R. 352 n.942.

*iii. The Bureau reasonably considered merchant cash advance providers' putative "reliance" on not being regulated.*

Plaintiff claims that the Bureau did not sufficiently address its concern that not excluding MCAs from the Rule would upend MCA providers' "reliance interests" in not being regulated. Mot. at 27-28. But Plaintiff does not point to any reasonable reliance interest that the Bureau did not consider. In its comment letter, Plaintiff explains that its members' putative reliance interests are based on the "Bureau [having] previously indicated *in the context of factoring* that 'the purchase of accounts receivable' does not constitute 'credit.'" A.R. 19418 (emphasis added). But as explained above, and as both the proposed rule and the Final Rule discuss in detail, factoring is different from MCAs in key respects. *See, e.g.*, A.R. 74. (Even Plaintiff appears to recognize the difference. *See, e.g.*, Mot. at 5, 18 (distinguishing between "factoring" and "sales-based financing").) The Bureau never expressed the view that MCAs are not "credit" under ECOA.

And even in the 2020 Final Report following the SBREFA process, which preceded the proposed rule and comment period by nearly a year, it was clear that MCAs and factoring would not necessarily be treated similarly in the Bureau's rulemaking. *See* A.R. 1172. That Report explained that "[m]any SERs [the small entity representatives that help provide feedback to the agency during the SBREFA process] advocated for including MCAs within the scope of the eventual 1071 rule," and that "SERs urged inclusion of MCAs due to their widespread use by small businesses." The Report relayed many specific concerns from small entity representatives about MCAs, including that MCA providers use "predatory" practices and that excluding MCAs from the Rule could "further enable such practices." *Id.* The Report separately discussed factoring; and while it noted that "*some* SERs also advocated for including factoring," *id*. (emphasis added), it did not discuss any specific comments supporting that policy. Moreover, the 2021 proposed rule explained that, having received feedback provided during the SBREFA

process and considered the issues further, the Bureau was proposing not to exclude MCAs from Section 1071's data reporting requirements. A.R. 473.

MCA providers, thus, have been on notice for a number of years that MCAs may be covered by the Rule, even while factoring may not. More generally, the statute itself provides that Section 1071 applies to "any application . . . for credit," 15 U.S.C. § 1691c-2(a), and it defines "credit" in sufficiently clear terms that MCA providers should have been aware that their offerings would qualify (and that the Bureau might not take steps to exclude them from coverage under the Rule). To the extent Plaintiff is claiming a general reliance by MCA providers in offering credit but not being regulated as credit, that reliance was not reasonable. *Cf. supra* at 20 (collecting some cases under state law recognizing that MCAs are loans).

This situation thus is markedly different from the type of "unfair surprise" addressed in the cases Plaintiff cites. *See* Mot. at 28. In *Christopher v. SmithKline Beecham Corp.*, for example, the Supreme Court addressed a regulatory interpretation that would "impose potentially massive liability . . . for conduct that occurred well before that interpretation was announced." 567 U.S. 142, 155-56 (2012). In contrast, here (where covered institutions are not yet required to provide any data), any compliance obligations of MCA providers come years after the Bureau explained why MCAs should be covered by its Rule and properly sought comment on doing so. This cannot be said to result in "unfair surprise." *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170-71 (2007) (deferring to new interpretation that "create[d] no unfair surprise" because agency had proceeded through notice-and-comment rulemaking).

In any event, even where an agency policy implicates "serious reliance interests," the result is only that the agency might have to provide "a more detailed justification" of its policy choice than is usually required. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515

(2009). The Bureau did exactly that in the Rule, explaining why the fair lending concerns surrounding MCAs and the need for more data about this type of credit, especially given its increasing prevalence in the small business market, and particular prevalence among minority-owned businesses, make inclusion of MCAs in the Rule "important to fulfilling both the fair lending and the business and community development purposes of section 1071." A.R. 71-75.

### III.   The Bureau's statutory funding mechanism provides no grounds for setting aside the Rule.

Plaintiff also claims that the Rule is invalid because the statutory provisions by which Congress chose to fund the Bureau's operations are unconstitutional. *See* Mot. at 28; 12 U.S.C. § 5497. While Plaintiff relies on the Fifth Circuit's ruling in *Cmty. Fin. Servs. Ass'n of Am., Ltd., v. CFPB*, 51 F.4th 616 (5th Cir. 2022), the Supreme Court is currently reviewing that decision and is expected to issue a decision by June, *see CFPB v. CFSA*, No. 22-448 (argued Oct. 3, 2023). The Bureau will promptly notify the Court of relevant developments in that case.

In any event, *CFSA* was wrongly decided, as numerous courts have now held. *See, e.g., CFPB v. Law Offices of Crystal Moroney*, 63 F.4th 174, 181 (2d Cir. 2023) (finding "no support" for the Fifth Circuit's reasoning "in Supreme Court precedent," "in the Constitution's text," or "in the history of the Appropriations Clause" and upholding the Bureau's funding). For the reasons expressed in those decisions, and those further explained in the Solicitor General's brief to the Supreme Court, *see* Br. of Pet., *CFPB v. CFSA,* No. 22-448 (U.S. May 8, 2023), 2023 WL 3385418, the Bureau is entitled to judgment as a matter of law on this claim.

### CONCLUSION

For these reasons, the Court should grant summary judgment to the Bureau on all counts.

April 12, 2024                                    Respectfully submitted,

                                                  */s/ Andrea J. Matthews*

                                                  Seth Frotman
                                                      *General Counsel*
                                                  Steven Y. Bressler
                                                      *Deputy General Counsel*
                                                  Kevin E. Friedl
                                                      *Acting Assistant General Counsel*
                                                  Karen S. Bloom (NY # 4438917)
                                                  Andrea J. Matthews (MA #693538)
                                                      *Senior Counsel*
                                                  Consumer Financial Protection Bureau
                                                  1700 G Street NW
                                                  Washington, DC 20552
                                                  (202) 407-2324 (phone)
                                                  (202) 435-7024 (facsimile)
                                                  andrea.matthews@cfpb.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 12, 2024, I electronically filed the foregoing cross-motion and opposition with the Clerk of the Court of the United States District Court for the Southern District of Florida using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

April 12, 2024                                              */s/ Andrea J. Matthews*