UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-24882-CIV-LEIBOWITZ/SANCHEZ

REVENUE BASED FINANCE COALITION,

     Plaintiff,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

     Defendants.

_____/

### REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

     This matter is before the Court on Plaintiff Revenue Based Finance Coalition's ("Plaintiff"

or "RBFC") Motion for Summary Judgment (ECF No. 23) and a Cross-Motion for Summary

Judgment (ECF No. 25) filed by Defendants Consumer Financial Protection Bureau and its

Director, Rohit Chopra (collectively, the "Bureau").[1]  RBFC seeks review under the Administrative

Procedure Act ("APA") of the Bureau's final rule requiring financial institutions to collect and

report data for applications for credit (the "Final Rule").[2]  More specifically, RBFC challenges the

fact that the Final Rule does not exclude a class of financial transactions known as merchant cash

---

[1] The Honorable David S. Leibowitz, United States District Judge, referred these motions to the undersigned for a Report and Recommendation.  ECF Nos. 59, 62.

[2] *See Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023), JA 172-593 ("Final Rule").  Despite the more than 400 pages of commentary accompanying the Final Rule, the text of the rule itself spans only seven pages of the Federal Register, 88 Fed. Reg. 35,527-33.  JA 549-55.  The Final Rule is now largely codified at 12 C.F.R. §§ 1002.101-1002.114, and includes corresponding implementing amendments at 12 C.F.R. §§ 1002.1(a), 1002.2, 1002.5(a)(4), and 1002.12(b).

advances ("MCAs") from the rule's coverage.[3]  Having carefully reviewed the motion papers, the

pertinent portions of the Administrative Record, including the Joint Appendix (ECF Nos. 50-56),[4]

the *amicus curiae* briefs (ECF Nos. 28-1, 35, 42), and the applicable law, and the undersigned

being otherwise fully advised in the premises, for the reasons discussed below, the undersigned

**RESPECTFULLY RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No.

23) be **DENIED** and Defendants' Cross-Motion for Summary Judgment (ECF No. 25) be

**GRANTED**.

## I.      BACKGROUND

### A.  Section 1071

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection

Act ("Dodd-Frank Act").  Pub. L. No. 111-203, 124 Stat. 1376 (2010).  Section 1071 of the Dodd-

Frank Act amended the Equal Credit Opportunity Act of 1974, 15 U.S.C. § 1691 *et seq.* ("ECOA")

to require financial institutions to collect and report to the Bureau data concerning applications for

credit for women-owned, minority-owned, and small businesses.  *See* Pub. L. No. 111-203, tit. X,

§ 1071, 124 Stat. 1376, 2056-59 (amending ECOA by adding section 704B), codified at 15 U.S.C.

§ 1691c-2.  The express purpose of Section 1071 is "to facilitate enforcement of fair lending laws

---

[3] The Court notes that the parties use two different terms to describe the same class of financial transaction.  *Compare, e.g.*, ECF No. 23 at 4 n.1 (RBFC explaining its use of "sales-based financing") *with* ECF No. 25 at 3 n.1 (the Bureau explaining that its brief uses "merchant cash advance" or "MCA").  For clarity, the Court refers to them as they were addressed in the Final Rule—MCAs.  In any event, this is a distinction without any practical difference.  *Cf. CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d. 729, 766 (S.D.N.Y. 2018) (explaining how a transaction must be "considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it") (internal quotations and citation omitted), *rev'd in part on other grounds by* 828 F. App'x 68 (2d Cir. 2020) (summary order); *see also* JA 259 (the Bureau explaining that "the name used by the financial institution for a product is not determinative of whether or not it is a 'covered credit transaction'").

[4] This Report and Recommendation cites to materials in the Administrative Record as "JA [Page Number]" if they are included in the Joint Appendix and as "AR [Page Number]" if they are not.

and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." 15 U.S.C. § 1691c-2(a).

To fulfill that dual purpose, Section 1071 requires financial institutions to gather and maintain certain information upon "any application to a financial institution for credit." 15 U.S.C. § 1691c-2(b). Specifically, financial institutions shall "inquire whether the business is a women-owned, minority-owned, or small business." *Id.* § 1691c-2(b)(1). Following that inquiry, financial institutions must also compile several specific data points along with "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." *Id.* § 1691c-2(e)(2).

**B. Proposed Rule**

Under Section 1071, the Bureau is required to "prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section." 15 U.S.C. § 1691c-2(g)(1). Section 1071 also authorizes—but does not require—the Bureau to create exceptions to the requirements of Section 1071 and to exempt financial institutions or classes of financial institutions from the requirements of Section 1071 "as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]." *Id.* § 1691c-2(g)(2). To that end, in 2021, the Bureau published a proposed rule entitled "Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)," 88 Fed. Reg. 56,356 (Oct. 8, 2021) ("Proposed Rule"). JA 42-57.

As relevant here, the Proposed Rule did not seek to exclude merchant cash advances ("MCAs") from the collection and reporting requirements. JA 49 (indicating that "[l]oans, lines of credit, credit cards, *and MCAs* . . . would all fall within the scope of this proposed rule, which would cover the majority of products that small businesses use to obtain financing") (emphasis

added); *see also* JA 52 (explaining that proposed rule would "cover MCAs as reportable under 1071" because of the "proposed definition of 'credit'").  Rather, the Proposed Rule noted that, in response to outreach from the Bureau, many stakeholders, including representatives of small business entities, community groups, and industry representatives, had "urged the inclusion of MCAs" in the rule for reasons that included their widespread use by small businesses and their disproportionate use by minority-owned small businesses and because MCAs should be considered credit under Section 1071.  JA 51.  The Proposed Rule also noted reports of harmful practices by some MCA providers that "len[t] credence to many stakeholders' claims that MCAs may raise fair lending concerns." *Id.*  Accordingly, the Bureau sought public comment on its "proposed approach to covered credit transactions, and in particular, whether it should define MCAs and/or other sales-based financing transactions, and if so, how."  JA 52.

## C.  Merchant Cash Advances ("MCAs")

The parties spill a lot of ink on what is and is not an MCA, but ultimately, they describe MCAs similarly.  Indeed, RBFC explains that under an MCA agreement, "a small business receives a lump-sum payment in exchange for the right to receive a percentage of the small business's future sales or income up to a ceiling amount."  ECF No. 23 at 4.  RBFC provides the following example:

> For example, assume Company A executes a [MCA] agreement with a provider, under which Company A agrees to give 5% of its monthly revenues to the provider up to $100,000; and in return, the provider gives Company A $90,000, which represents the $100,000 of future revenues discounted at a rate of 1.11 (referred to as the "factor rate") to account for the Company's and industry's performance. Assuming Company A consistently generates $200,000 of revenue each month, it will transfer $10,000 to the provider each month for 10 months until the $100,000 ceiling amount is reached.

*Id.*  In the commentary accompanying the Final Rule, the Bureau similarly describes the typical MCA as a transaction where:

> a merchant receives a cash advance and promises to repay it plus some additional amount or multiple of the amount advanced (*e.g.*, 1.2 or 1.5, the "payback" or

"factor" "rate").  The merchant promises to repay by either pledging a percentage of its future revenue, such as its daily credit and debit card receipts (the "holdback percentage"), or agreeing to pay a fixed daily withdrawal amount to the [MCA] provider until the agreed upon payment amount is satisfied.

JA 242.  Significantly, the Bureau recognized that "[m]erchant cash advances vary in form and substance" and acknowledged that its comments concerning MCAs addressed "typical" MCAs. JA 242 & n.358.

**D.  Public Comments and the Final Rule**

In response to the Proposed Rule, the Bureau "received comments on [MCAs] from a wide range of lenders, trade associations, business advocacy groups, community groups, individuals, the offices of two State attorneys general, and others."  JA 243.  The Final Rule observed that "with the exception of a sole credit union trade association, the only commenters that supported the exclusion of [MCAs] from the rule were [MCA] providers or trade associations representing [MCA] providers."  JA 244.  One of these commenters was RBFC.  *See* JA 78-116; AR 19,401-39.  There, RBFC addressed the same central argument it raises here—that MCAs should not be regulated as credit transactions.  *See* JA 78.

In response to public comments, the Bureau did not make any meaningful changes to the Final Rule regarding MCAs.  The Final Rule followed the Proposed Rule and did not exclude MCAs from data collection and reporting requirements.  Instead, the Rule defined covered credit transactions using ECOA's statutory definition of "credit" and declined to adopt a definition that "explicitly state[s] that it applies to any particular type of credit, whether it be installment, loans, credit cards, or merchant cash advances," because the Bureau "believe[d] that the statutory term 'credit' in ECOA is intentionally broad so as to include a wide variety of products without specifically identifying any particular product by name."  JA 245; *see* 12 C.F.R. § 1002.104 (not excluding MCAs from the definition of "covered credit transaction").

5

In commentary, however, the Bureau did interpret the Rule's definitions of "credit" and "covered credit transactions" to "include all business credit (including loans, lines of credit, credit cards, and merchant cash advances)" that are not excluded by § 1002.104(b), JA 564; *see also* JA 245, and the Rule did set forth one data item that was to be compiled for covered credit transactions that was specific to MCAs or other sales-based financing, *see* 12 C.F.R. § 1002.107(a)(12)(v) (requiring, for "a merchant cash advance or other sales-based financing transaction," data about "the difference between the amount advanced and the amount to be repaid"). The Bureau explained "that the inclusion of merchant cash advances in the Bureau's [final] rule is important to fulfilling both the fair lending and the business and community development purposes of Section 1071." JA 245-46. The Final Rule also noted that data from MCA transactions would reflect financing demand by "the smallest and most vulnerable businesses." JA 246. RBFC now brings the instant challenge to the Final Rule.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citations omitted). "In such cases, summary judgment is the vehicle for deciding 'whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'" *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, No. 9:21-CV-81505-DMM, 2023 WL 3600665, at *6 (S.D. Fla. Mar. 21, 2023) (quoting *Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1350 (M.D. Fla. 2016), *aff'd sub nom. Brinklys v. Sec'y, Dept. of Homeland Sec.*, 702 F. App'x 856 (11th Cir. 2017)); *see also Preserve Endangered Areas of Cobb's*

*History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246-47 (11th Cir. 1996) (explaining that a court conducting a judicial review of agency action is to apply the APA standard of review to the administrative record on summary judgment).

Under the APA, courts are to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). When determining if an agency exceeded its regulatory authority, Courts no longer defer to an agency's interpretation of ambiguous statutes, and instead "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

"[I]n APA actions, the district court . . . review[s] whether an agency's actions, findings, or conclusions are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Kane v. U.S. Att'y Gen.*, No. 23-14192, 2024 WL 3650239, at *5 (11th Cir. Aug. 5, 2024) (quoting 5 U.S.C. § 706(2)(A)). "[T]his standard is exceedingly deferential," *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996), and district courts are limited to "assess[ing] whether the agency arrived at a rational conclusion connected to the evidence," *Salmeron-Salmeron v. Spivey*, 926 F.3d 1283, 1288 (11th Cir. 2019). Under this standard, agency action may be found arbitrary and capricious where

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

RBFC challenges the Final Rule on two separate grounds. First, RBFC alleges that the Bureau exceeded its authority when it promulgated the Final Rule because MCAs are not "credit"

under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA").  *See* ECF No. 23 at

11-19.  Second, RBFC claims that the Final Rule is arbitrary and capricious under the APA because

the Bureau only chose to regulate MCAs to "level the playing field" for competitors of MCA

providers and failed to properly consider RBFC's public comments during the rulemaking process.

*See id.* at 19-28.[5]

The Bureau counters that it was well within its statutory authority when it issued the Final

Rule because "MCAs fit squarely within ECOA's definition of th[e] term ['credit']."  ECF No. 25

at 9; *see also id.* at 10-20.  The Bureau further contends that the Final Rule is not arbitrary and

capricious because the Bureau's decision not to exempt MCAs in the Final Rule was based on a

reasonable and proper rationale, and it did not "fail[] to respond adequately to comments during

the rulemaking."  ECF No. 25 at 20; *see id.* at 9, 20-35.

### III.    ANALYSIS

### A.  The Bureau Did Not Exceed Its Authority by Adopting the Final Rule.

RBFC argues that the Bureau exceeded its statutory authority when it adopted the Final

Rule because the rule will apply to MCAs.  *See* ECF No. 23 at 20 ("[T]he Bureau exceeded its

statutory authority when it subjected sales-based financing providers to regulation under the Final

Rule.").  However, a review of the language of the adopted rule in the context of the statutory

mandate and the statutory language that the rule seeks to implement reveals that RBFC's argument

fails.

---

[5] RBFC also argues that the Final Rule is invalid because the Bureau uses "unconstitutionally
structured funding," ECF No. 23 at 28, but the Supreme Court has rejected that argument.  *CFPB
v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024) ("In this case, we must decide
the narrow question whether [the CFPB's] funding mechanism complies with the Appropriations
Clause.  We hold that it does.").  The Bureau is accordingly entitled to summary judgment on this
issue.

1.  *The Final Rule Tracks the Governing Statutory Definition of Credit When Defining the Scope of Covered Transactions.*

Notwithstanding RBFC's arguments, nothing in the text of the actual Final Rule states that MCAs (or sales-based financing) are "covered credit transactions" subject to the Rule.  88 Fed. Reg. 35,529 (12 C.F.R. § 1002.103(a)).  On the contrary, the Rule provides that a "*[c]overed credit transaction* means an extension of business credit that is not an excluded transaction under paragraph (b) of this section." *Id.*  The Rule further provides that "business credit" has the "same meaning" as in 12 C.F.R. § 1002.2(g), which "refers to extensions of credit primarily for business or commercial (including agricultural) purposes," with exclusions for public utilities credit, securities credit, incidental credit, and government credit.  *See* 88 Fed. Reg. 35,529 (12 C.F.R. § 1002.102(d)).  Furthermore, under applicable pre-existing rules, an "extension of credit" means "the granting of credit in any form," 12 C.F.R. § 1002.2(q), and "credit" is defined as "the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor," 12 C.F.R. § 1002.2(j); *see* 88 Fed. Reg. 35,529 (12 C.F.R. § 1002.102(i)).

Here, the Final Rule was adopted pursuant to ECOA's statutory mandate, created by Section 1071 of the Dodd-Frank Act, that "[t]he Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to" the section.  15 U.S.C. § 1691c-2(g)(1).  More particularly, the Rule seeks to implement that statute's specific requirements that, "in the case of any application to a financial institution for credit," the financial institution shall "inquire whether the business is a women-owned, minority-owned, or small business" and shall compile, maintain, and submit to the Bureau particular data concerning the credit application, applicant, and transaction.  15 U.S.C. § 1691c-2(b), (e), (f).  For purposes of these statutory ECOA requirements, "[t]he term 'credit' means the right granted by a creditor to a

debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d).

A comparison of the Final Rule and the governing statutory provisions reveals that the credit transactions covered by the Final Rule are precisely the credit transactions that are encompassed by 15 U.S.C. § 1691c-2 and that § 1691c-2 directed the Bureau to address. Indeed, both § 1691c-2 and the Final Rule use the same definition of "credit" to define the scope of the applications and transactions that are the subject of those respective provisions. *Compare* 15 U.S.C. § 1691a(d) *with* 12 C.F.R. § 1002.2(j). Because the Final Rule applies to the very credit transactions that are the subject of § 1691c-2 and its statutory mandate that the Bureau "prescribe such rules . . . as may be necessary to carry out, enforce, and compile data pursuant to" § 1691c-2, the Bureau simply did not exceed its statutory authority through its definition of the scope of the credit transactions covered by the Rule. If MCA transactions fall within the scope of the Final Rule, it is simply because those transactions also fall within scope of 15 U.S.C. § 1691c-2.

Because the language of the Rule addressing the scope of covered credit transactions complies with 15 U.S.C. § 1691c-2, RBFC's argument must thus amount to an argument that the Bureau exceeded its statutory authority because it did not exclude MCAs from the Final Rule and because it interpreted the Rule's definitions of "credit" and "covered credit transactions" to "include all business credit (including loans, lines of credit, credit cards, and merchant cash advances)" that are not excluded by § 1002.104(b). *See* JA 564; *see also* JA 245.

2. *The Decision Not to Exclude MCAs from the Scope of the Definition of Covered Credit Transactions Was Authorized by Statute.*

In terms of the Bureau's decision not to specifically exclude MCAs from the scope of covered credit transactions, the Bureau did not exceed the scope of its authority. Indeed, § 1691c-2 specifically provides as follows:

10

> The Bureau, by rule or order, *may* adopt exceptions to any requirement of this section and *may*, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, *as the Bureau deems necessary or appropriate to carry out the purposes of this section*.

15 U.S.C. § 1691c-2(g)(2) (emphasis added).  Thus, when the Bureau adopted a rule that did not specifically exclude, except, or exempt MCAs or sales-based financing transactions from the rule's definition of covered credit transactions, a definition that tracked ECOA's definition of credit, the Bureau did not exceed its statutory authority.  *See id.*; *see also* 15 U.S.C. § 1691a(d); 12 C.F.R. §§ 1002.2(j), 1002.102(i), 1002.104.

3. *The Bureau's Interpretation That the Final Rule's Definition of Covered Credit Transactions Includes MCAs Comports with the Governing Statute and Does Not Exceed the Bureau's Statutory Authority.*

Although RBFC challenges the Final Rule as exceeding the Bureau's statutory authority by subjecting MCAs to the Rule because, according to RBFC, MCAs do not meet ECOA's definition of "credit," *see* ECF No. 23 at 11-19, the Bureau's interpretation of the Rule's definitions of "credit" and "covered credit transactions" to "include all business credit (including loans, lines of credit, credit cards, and merchant cash advances)" that are not excluded by § 1002.104(b), *see* JA 564; *see also* JA 245, did not exceed the Bureau's lawful authority.

In ECOA, Congress defined "credit," in relevant part, as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment."  15 U.S.C. § 1691a(d). Thus, for MCAs to qualify as "credit," they must (1) defer payment; (2) of a debt.  The parties agree on this definition, *see, e.g.*, ECF No. 23 at 12; ECF No. 33 at 8; ECF No. 43 at 2—which, as explained above, is the same definition used in the Final Rule, *see* 12 C.F.R. §§ 1002.2(j), 1002.102(i)—but disagree on whether MCAs fit the definition.

a. <u>MCAs Involve Debt.</u>

Here, both parties acknowledge that "debt" is not defined in ECOA, Section 1071, or even in the implementing rules, so the "ordinary meaning" of the word "debt" controls. *See* ECF No. 33 at 9; ECF No. 25 at 15; ECF No. 23 at 12; *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) ("In the absence of a statutory definition of a term, [courts] look to the common usage of words for their meaning.") (quoting *Consol. Bank, N.A. v. U.S. Dep't of Treasury,* 118 F.3d 1461, 1464 (11th Cir. 1997)).  The parties, however, quarrel over the meaning of "debt" and the dictionaries that should be used to determine that meaning.  *See* ECF No. 23 at 12-13; ECF No. 25 at 15; ECF No. 33 at 9-10.

Although the word debt has been defined in sundry ways and contexts, *see, e.g.*, *Debt, Black's Law Dictionary* (4th rev. ed. 1968), for pertinent purposes, a common, ordinary meaning of the term at the time ECOA was enacted can be distilled to the following:  A debt is a party's legal or contractual obligation to pay in the future that which is owed for consideration received in the present.  *See, e.g.*, *id.*; *Debt, Oxford English Dictionary* (3d ed. 1973).

As discussed above, an MCA is an agreement between a merchant and an MCA provider in which a lump-sum payment is given to the merchant and the merchant agrees to pay back that money (with an additional sum) through future revenues.  Because the merchant becomes contractually obligated to pay the provider money owed to the provider in accordance with the terms of the MCA agreement, the money owed by the merchant is a "debt" within the meaning of ECOA.

RBFC contends, however, that "debt" should be defined more narrowly as "(1) an obligation, (2) to repay a specific sum of money owed, and (3) that is enforceable by the creditor." ECF No. 33 at 9.  RBFC then argues that a business's obligation in an MCA "cannot be viewed as

12

a promise to repay," but must instead be viewed as a "promise[] to deliver to the provider the property purchased by the provider."  ECF No. 33 at 10.  According to RBFC, there is no promise of repayment from the merchant because, through the MCA agreement, "a business *sells* the right, title, and interest in a portion of its future sales."  ECF No. 33 at 10 (emphasis added).[6]

Here, contrary to RBFC's contentions, *see* ECF No. 33 at 2, RBFC has failed to establish that an MCA transaction is a purchase of all right, title, and interest in any portion of a merchant's future revenues.  Although RBFC points to several MCA agreements that use wording that attempts to cast the agreement as a purchase and sale, *see* AR 13031 ("Buyer hereby purchases from Seller . . . all of Seller's rights to payments from Seller's customers."); ECF No. 33 at 3 n.2 (citing agreements), the reality is that an MCA agreement is not a sale of an existing asset or property interest.[7]  A merchant cannot sell—and another cannot buy—all right, title, and interest in something which does not yet exist (that is, future sales revenues hoped to be received from as-yet-unknown parties in unknown future transactions that may never transpire) and in which the merchant therefore holds no present property interest; the merchant can only *promise* to deliver (or pay) that "something" in the future.  Even though a merchant may hope, anticipate, or even

---

[6] Significantly, RBFC has limited its challenge in this case only to the Bureau's application of the Final Rule to those MCA agreements "that involve purchasing the right, title, and interest in future [sales] revenues, with obligations to tender funds only if those sales arise."  ECF No. 33 at 15.  RBFC has thus abandoned any challenge to the Bureau's application of the Rule to any other MCA transactions, effectively conceding that the Bureau did not exceed its authority by declining to exclude all MCAs from application of the Final Rule.

[7] Notably, the agreements which RBFC cites actually reflect that MCA providers lack "all right, title, and interest" in merchants' future sales; those agreements instead contain a variety of provisions which establish that the merchant is required to promise to undertake a variety of obligations in the future so that the pertinent portion of the funds paid to a merchant from future sales will be transferred and/or made available to the MCA provider in the future (that is, the merchant shall pay the MCA provider in the future from the funds the merchant acquires) if and when those future sales materialize.  *See* JA 594-95 (AR 13031-32), JA 619-26 (AR 13056-60); *see also, e.g.*, JA 606-18 (AR 13043-55).

expect future revenues, "a mere unilateral expectation or an abstract need is not a property interest" the law recognizes. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980); *cf. United States v. Cent. Med. Sys., LLC*, No. 614CV512ORL28TBS, 2018 WL 5112911, at *7 (M.D. Fla. Oct. 19, 2018) (defendants have property interest in claims submitted for payment to Medicare because they have "more than an abstract need or desire . . . [or] unilateral expectation" of payment) (alterations in original) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Thus, when viewing MCA agreements as a whole rather than focusing on isolated wording, the nature, substance, and reality of the MCA agreements, rather than the labels and wording that RBFC has pointed to in some of those agreements, establish that such MCA agreements are not contracts that involve the purchase and sale of an existing asset or property interests, but are instead contracts in which a merchant promises to repay the MCA provider from its future revenues. *See, e.g.*, *Rhodes v. United States*, 464 F.2d 1307, 1311 n.4 (5th Cir. 1972) (in analyzing the tax implications of a contract, "[w]e do not overlook the fact that labels or words used by the parties in forming their contract are not controlling"); *Black Warrior Elec. Membership Corp. v. Miss. Power Co.*, 413 F.2d 1221, 1225 (5th Cir. 1969) ("[W]e read what the agreement says against the essential realities of the situation."); *Golden v. Univ. of Miami*, 484 F. Supp. 3d 1255, 1263 (S.D. Fla. 2020) ("[C]ourts do not interpret contractual terms in isolation—'[i]n reviewing a contract . . . the entire contract must be reviewed as a whole without fragmenting any segment or portion.'") (quoting *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1296 (S.D. Fla. Sept. 30, 2011), *aff'd*, 720 F.3d 833 (11th Cir. 2013)).

RBFC then argues that MCAs do not meet the definition of "credit" because they "lack[] an *enforceable* obligation when sales decline or cease." ECF No. 33 at 10. RBFC, however, has failed to establish that MCA agreements fails to create enforceable obligations. The fact that

monetary obligations owed by a merchant under an MCA agreement may be reduced, increased, or even satisfied or extinguished in the future pursuant to the terms of the MCA agreement does not make a merchant's legal obligations under the agreement unenforceable.  Rather, terms that tie repayments to sales merely define the contours and conditions of the parties' contractual rights and obligations, as well as the resulting debt, that were established by the MCA agreement and that are subject to legal enforcement.  The possibility that the obligations owed under the terms of an MCA agreement may prove less valuable to an MCA provider than originally anticipated is a contractual risk undertaken by the MCA provider and does not make the merchant's MCA contractual obligations unenforceable.  Indeed, the MCA agreements to which RBFC has pointed in its brief, *see* ECF No. 33 at 3 n.2, contain a myriad of provisions and contractual enforcement mechanisms through which an MCA provider may enforce a merchant's obligations under an MCA agreement. *See also, e.g.*, ECF No. 23 at 4 (RBFC describing a scenario where a company transfers $10,000 to the MCA provider each month); *id.* at 14 (recognizing that MCAs provide for automatic repayment); JA 603 (agreement where the merchant authorizes the MCA provider to debit the merchant's account "on any Monday through Friday").  Moreover, being able to successfully *collect* on a debt is different than being able to *enforce* one's rights under a contract.  RBFC has identified nothing that prevents an MCA provider from asserting its right to enforce an MCA agreement through the courts in the event that a merchant breaches the MCA agreement and does not pay the MCA provider in accordance with the terms of the MCA agreement.

On this record, the Bureau's conclusion that MCAs involve "debt" is well supported and did not exceed the Bureau's statutory authority.

b.  <u>MCAs Grant Merchants the Right to Defer Payment.</u>

To be considered "credit," MCAs not only must involve "debt," but must also grant the right to defer payment of that debt.  *See* 15 U.S.C. § 1691a(d).  RBFC argues that MCAs do not grant merchants a right to defer payment of a debt because a merchant "has no obligation to tender funds unless it generates sales."  ECF No. 33 at 15.  This argument, however, entirely fails to understand what a deferral of payment means.[8]  The fact that a merchant is not obligated to tender funds—that is, pay its debt to the MCA provider—until future sales are made *is the very right to defer payment of a debt that an MCA grants*.  The deferral of the repayment of an MCA arises when money is advanced to a merchant and the merchant is allowed to delay payment of the resulting contractual debt until a future time.  As the Bureau states, "[e]xchanging cash for a promise to pay money later is credit in the most basic sense of the term."  ECF No. 43 at 4.

Because the Court finds that MCA agreements confer "a right to defer payment of a debt," MCAs meet the statutory definition of "credit," and the Bureau did not exceed its authority in treating MCAs as credit transactions in the Final Rule.  *See* 15 U.S.C. § 1691a(d).

**B.  The Final Rule Is Not Arbitrary or Capricious.**

RBFC also challenges the Final Rule by arguing that it is "arbitrary and capricious because it was motivated by an improper aim to benefit sales-based financing competitors," and because "the Bureau failed to respond adequately to material comments."  ECF No. 23 at 19-28.  RBFC's arguments are unavailing.

---

[8] The Court also notes that this assertion by RBFC that a merchant has an "obligation to tender funds" to the MCA provider (that is, to pay the MCA provider) when the merchant generates sales essentially acknowledges that MCAs involve the creation of a debt—an obligation to pay in the future funds that a merchant contractually owes under the terms of an MCA agreement.

16

*1.  The Bureau Did Not Act with Improper Motives.*

"When a party challenges agency action as arbitrary and capricious the reasonableness of the agency's action is judged in accordance with its stated reasons."  *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 156 F.3d 1279, 1279 (D.C. Cir. 1998) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)).  As explained above, the purpose of Section 1071 "is to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses," 15 U.S.C. § 1691c-2(a), and Congress has entrusted the Bureau to "prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to [Section 1071]."  15 U.S.C. § 1691c-2(g)(1).

RBFC argues that the Bureau relied on an impermissible consideration under ECOA and Section 1071 when it promulgated the Final Rule to "create a more level playing field" among industry participants.  ECF No. 23 at 19-24; ECF No. 33 at 18-19.  RBFC takes issue with the following statement from the Final Rule:

> The Bureau also believes that including merchant cash advances will create a more level playing field across financial institutions that provide cash flow financing to small businesses by shedding light on such credit transactions as well as create a dataset that better reflects demand for such financing by the smallest and most vulnerable businesses.

JA 246.  According to RBFC, the Bureau's creation of a "more level playing field" amounts to the Bureau's imposition of regulatory burdens on MCA providers at the behest of their competitors to benefit those competitors.  ECF No. 23 at 21-22; ECF No. 33 at 18.  RBFC attempts to connect the Bureau's "level playing field" comment to the Proposed Rule, where the Bureau explained that it had been considering exempting MCAs from the rule but decided to include them after stakeholders expressed concern that excluding MCAs "would create unequal regulatory burdens."

17

ECF No. 33 at 19; *see* JA 51.  In response, the Bureau claims that RBFC selectively quotes the "level playing field" passage, and that "[r]ead in the proper context, the phrase 'more level playing field' refers to how declining to exempt MCA providers from Section 1071's requirements would help to generate more complete data on the MCA market in furtherance of Section 1071's purposes."  ECF No. 43 at 12; *see also* ECF No. 25 at 24-25.

Reviewing the challenged "playing field" comment, especially in the context of the record, the Court finds that the Bureau's explanation makes sense and that the Bureau was not motivated by any improper purpose or consideration.  There is no indication that the Bureau promulgated the Final Rule because of any animus toward MCA providers; rather, the primary passage RBFC relies on indicates that the Bureau intended the "more level playing field" phrase to refer to the Rule's entirely proper purpose to collect data across credit providers, including MCA providers, in accordance with the Bureau's statutory purposes to collect data and shed light on credit transactions, which serves the statute's stated purposes of facilitating the enforcement of fair lending laws and enabling the identification of needs and opportunities for small businesses, *see* 15 U.S.C. §§ 1691c-2(a), (g)(1).  The record simply does not support the conclusion that the challenged statement reveals an intent to impose a regulatory burden on MCA providers and impact their ability to compete with other financial institutions.  Recognizing that the arbitrary and capricious standard is "exceedingly deferential" to agencies, *Fund for Animals, Inc.*, 85 F.3d at 541, the Court simply does not find that the Bureau "has relied on factors which Congress has not intended it to consider."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

2. *The Bureau Adequately Considered RBFC's Comment Letter.*

When an agency undertakes notice-and-comment rulemaking under the APA, after it publishes a notice of proposed rulemaking in the Federal Register and solicits comments on the

proposed rule, it "must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see* 5 U.S.C. § 553. Then, "when the agency promulgates the final rule, it must include in the rule's text 'a concise general statement of [its] basis and purpose.'" *Perez*, 575 U.S. at 96 (quoting § 553(c)). The general statement "must rebut vital relevant or significant comments." *Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1343 (11th Cir. 2021) (internal quotations omitted); *see Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992) ("Under the 'arbitrary and capricious' standard of review, an agency is . . . required to respond to significant comments that cast doubt on the reasonableness of the rule the agency adopts." (quoting *Baltimore Gas & Elec. Co. v. United States*, 817 F.2d 108, 116 (D.C. Cir. 1987))).

RBFC argues that the Bureau failed to consider the benefits of MCAs that RBFC raised in its Comment Letter and the potential negative impact that the Rule might have on such benefits. ECF No. 33 at 20-21; ECF No. 23 at 25-26. "For example, the Bureau never acknowledged sales-based financing brings small business[es] greater flexibility, does not require posting collateral, has higher approval rates, and helps small businesses by offering access to smaller amounts of capital." ECF No. 33 at 20; *see* ECF No. 23 at 25; AR 19,412-14.

In response, the Bureau argues that it acknowledged those potential benefits during the rulemaking process. ECF No. 43 at 13-15; *see, e.g.*, JA 50 n.363 (citing survey data that "84 percent of surveyed credit applicants were approved for an MCA, as compared to a 43 percent approval rate for personal loans"); JA 244 (recognizing that a few commenters "asserted that covering merchant cash advances is contrary to public policy because doing so will negatively impact access to financing and because they benefit businesses"); JA 185 ("The merchant cash

advance market is also of particular significance for smaller and traditionally underserved businesses that may not qualify for other types of credit.").

The Bureau recognized the limited number of commenters who argued against including MCAs in the Final Rule's definition of credit, which included RBFC, *see* JA 244, and it was thus important to address the comments by these rule opponents.  But the APA does not require agencies to respond to every point and argument raised in every comment, only to "*significant comments that cast doubt on the reasonableness of the rule the agency adopts.*"  *Hussion*, 950 F.2d at 1554 (emphasis added) (quoting *Baltimore Gas & Elec. Co*, 817 F.2d at 116); *see also Baltimore Gas & Elec. Co.*, 817 F.2d at 116 (acknowledging that "challenges to the internal integrity or reasonableness of the regulatory structure proposed might well cast such doubt, as would challenges to the lawfulness of the proposed rule").  RBFC's arguments about the benefits of MCAs do not undercut the reasonableness of the Final Rule by challenging its internal integrity, structure, or lawfulness.  *See Baltimore Gas & Elec. Co.*, 817 F.2d at 116.  In any event, the Bureau adequately considered and responded to RBFC's comments.  For example, it considered and discussed the benefits provided by MCAs and whether the Rule might negatively impact the availability of such benefits.  At the same time, the Bureau recognized that there were reports of "problematic provider practices" involving MCAs, and it explained that some of the benefits of MCAs (such as accessibility and higher approval rates) lead merchants who have no other financing options to turn to MCAs and risk jeopardizing their businesses because they may not fully recognize the costs of MCAs.  *See* JA 243.  On the record before it, the Bureau concluded that including MCAs in the definition of credit would "fulfill[] both the fair lending and the business and community development purposes of section 1071."  JA 245-46.  Here, the Court finds that the Bureau appropriately considered RBFC's comments when it adopted the Final Rule.

3.  *The Bureau Conducted an Appropriate Cost Analysis.*

RBFC next argues that the Final Rule is arbitrary and capricious because the Bureau "fail[ed] to show that it addressed or tried to justify the dearth of one-time cost data from sales-based financing providers and the limited data from nondepository institutions in promulgating the rule."  ECF No. 33 at 23.  When considering RBFC's argument, the Court must ensure that the Bureau "has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The Dodd-Frank Act also requires the Bureau to consider "the potential benefits and costs to consumers and covered persons" during the rulemaking process.  12 U.S.C. § 5512(b)(2)(A)(i); *see PayPal, Inc. v. CFPB*, 728 F. Supp. 3d 31, 43 (D.D.C. 2024).[9]

RBFC argues that this case mirrors *PayPal*, in which the U.S. District Court for the District of Columbia vacated a CFPB rule's short-form disclosure requirement as applied to digital wallets. 728 F. Supp. 3d. at 45.  There, however, the Bureau's cost-benefit analysis of the rule did not mention "digital wallets" even once.  *Id.* at 43.  In contrast, the Bureau here expressly addressed the costs and benefits of the Final Rule *on MCAs*.  *See, e.g.*, JA 522 (discussing comments on one-time costs for MCA providers and the data the Bureau relied on).  The Bureau acknowledged the data shortfalls, explained its efforts to acquire more data, explained its methodology, and explained that it had "relied on the data it had" to make its best analysis.  *See, e.g.*, JA 520-22.  "The APA requires no more."  *Prometheus Radio Project*, 592 U.S. at 427; *see also id.* at 425-27. Accordingly, the Court finds that the Bureau's cost analysis was sufficient.  *See Tex. Bankers Ass'n v. CFPB*, No. 7:23-CV-144, 2024 WL 3939598, at *14 (S.D. Tex. Aug. 26, 2024) (denying a

---

[9] An appeal of this case is currently pending before the U.S. Court of Appeals for the D.C. Circuit. *See PayPal, Inc. v. CFPB, et al.*, Case No. 24-5146 (D.C. Cir.).

challenge to the Small Business Lending Rule that also argued that the Bureau failed to adequately consider cost implications and finding that "[t]he Bureau considered the various costs in detail, engaged with the various concerns, data, and methodologies, and ultimately based its determinations on plausible justifications").[10]

### 4. The Bureau Reasonably Considered Any Reliance Interests.

An agency must provide justification for new policies "when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox. Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). The Supreme Court in *Smiley* cautioned agencies that "[s]udden and unexplained change" and "change that does not take account of legitimate reliance on prior interpretation" may be arbitrary and capricious, but that "if [such] pitfalls are avoided, change is not invalidating." 517 U.S. at 742.

Here, RBFC has not shown any legitimate reliance on prior Bureau interpretation. In the Final Rule, the Bureau cites reliance interests to explain, in part, why it excluded factoring from the Final Rule. JA 259 ("[T]he Bureau believes that requiring reporting for these transactions at this time would have the effect of upending market participants' settled expectations that 'factoring' is not credit within the meaning of existing Regulation B."). In its comments, RBFC attempts to extend the Bureau's recognition of the reliance interests for factoring providers to MCA providers. AR 19,411-12. But MCAs are not factoring agreements; unlike factoring agreements, MCAs do not involve the purchase of accounts receivable, an existing asset that is the product of historical—not future—transactions. Nor do MCAs have the same history and settled expectations

---

[10] An appeal of this case is currently pending before the U.S. Court of Appeals for the Fifth Circuit, which recently granted a stay pending appeal following the new President taking office. *See Tex. Bankers Ass'n v. CFPB*, Case No. 24-40705, 2025 WL 429913 (5th Cir. Feb. 7, 2025).

as factoring agreements.  Nowhere in its comments during the rulemaking process or in its briefing does RBFC point the Court to any prior agency policy on which MCA providers have relied.  The closest thing that RBFC points to is in the Proposed Rule, *see* JA 51, where the Bureau recognized that it had previously "stated that it was considering proposing that MCAs not be a covered product under section 1071," but ultimately decided not to proceed along that course after several stakeholders gave reasons that MCAs should be included.[11]  But the fact that something is under agency consideration is simply not the same as a prior policy.  Because RBFC has failed to identify what "prior policy has engendered serious reliance interests," the Bureau is not required to provide any additional justification to account for reliance interests.  *Fox Television Stations, Inc.*, 556 U.S. at 515; *cf. United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973) (reliance interests implicated when company showed it was "affirmatively misled by the responsible administrative agency into believing that the law did not apply in [that] situation").

In sum, the Court finds that, notwithstanding RBFC's challenges to the Rule and the rulemaking process, the Bureau's actions were not arbitrary and capricious.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned finds that the Bureau is entitled to judgment as a matter of law on each of Plaintiff's APA claims.   Accordingly, the undersigned **RESPECTFULLY RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 23) be **DENIED** and Defendants' Cross-Motion for Summary Judgment (ECF No. 25) be **GRANTED**.

Within fourteen (14) days from the date of receipt of this Report and Recommendation, the parties shall serve and file written objections, if any, to this Report and Recommendation with the

---

[11] Notably, the Bureau had not even announced that it was considering that proposal until September 15, 2020.  86 Fed. Reg. 56,376.

23

Honorable David S. Leibowitz, United States District Judge.  Failing to file timely objections will bar a de novo determination by the District Judge of any issue addressed in the Report and Recommendation, will constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions," and will only allow appellate review of the district court order "for plain error if necessary in the interests of justice."  11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

　　　　**RESPECTFULLY RECOMMENDED** in Chambers in Miami, Florida, this 17th day of February 2025.

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　EDUARDO I. SANCHEZ
　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

cc:　　Hon. David S. Leibowitz
　　　　Counsel of Record